Arthur JONES, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15187.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 25, 1960.

Decided July 14, 1960.

Petition for Rehearing En Banc Denied
Dec. 2, 1960.

Bazelon, Circuit Judge, dissented.

Mr. Charles V. Shannon, Washington, D. C., with whom Mr. Richard F. Generelly, Washington, D. C. (both appointed by this court) was on the brief, for appellant.

Mr. Lewis Carroll, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before WILBUR K. MILLER, BAZELON and BASTIAN, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

On November 15, 1958, when Arthur Jones committed the crimes involved in

this appeal,[1] he was already under indictment, but had not been tried, for breaking into a grocery July 29, 1958. In the housebreaking case, on motion duly made, the District Court entered an order September 30, 1958, committing Jones to the District of Columbia General Hospital for a period of 30 days for a determination whether he was then insane or so mentally incompetent as to be unable to understand the proceedings against him or to assist properly in his own defense. Some days thereafter he was admitted to the hospital and remained there until November 15, 1958. On November 13, Dr. James A. Ryan, Assistant Chief Psychiatrist of the General Hospital, certified to the District Court that the psychiatric examination revealed Jones to be "sane, competent and capable of participating in his own defense."

This incident of the housebreaking case, with which we are otherwise not now concerned, is important in the consideration of this appeal, because the psychiatric examination then conducted was the basis of Dr. Ryan's testimony, at the trial of the present case, that Jones was sane when he committed the crimes of November 15, 1958.

Two days after Dr. Ryan had certified that Jones was sane and mentally competent to stand trial, viz., in the evening of November 15, while he was being escorted from the patients' dining area to his ward in the hospital, Jones produced a previously concealed blade razor, viciously attacked the attendant in whose custody he was, wounded him severely, and forced him to surrender his keys, with the aid of which Jones escaped from the hospital. He was recaptured a few days afterward.

For these offenses he was indicted December 15, 1958, in three counts: (1) assault with a dangerous weapon; (2) stealing the keys; (3) escaping from lawful custody. At arraignment December 19, Jones appeared without counsel, pleaded not guilty, and announced "My defense will be insanity." His counsel, employed thereafter, filed January 26, 1959, in the proceeding based on the new three-count indictment, a motion for commitment to St. Elizabeths Hospital for 60 days for an examination to determine his mental competence to stand trial; and on February 6, 1959, it was so ordered. Under date of April 7, 1959, the Superintendent of St. Elizabeths certified to the court as follows:

> "Mr. Jones' case has been studied intensively since the date of his admission to Saint Elizabeths Hospital and he has been examined by several qualified psychiatrists attached to the medical staff of Saint Elizabeths Hospital as to his mental condition. On April 6, 1959, Mr. Jones was examined and the case reviewed in detail at a medical staff conference. We conclude, as the result of our examinations and observation, that Arthur Jones is mentally competent to understand the proceedings against him and to properly assist in his own defense."

On April 23, 1959, Jones was tried before Judge F. Dickinson Letts for the offenses charged in the three-count indictment of the previous December 15, a jury having been waived. The facts concerning the escape from custody were stipulated and the cutting of the attendant and the theft of the keys were quickly proved and not denied. True to the appellant's own prediction, the only defense was a plea that he was insane on November 15, 1958, when the three criminal acts were committed. In support of that defense, Jones introduced Dr. Mauris M. Platkin, a psychiatrist from St. Elizabeths who had observed him during the period from his commitment on February 13, 1959,[2] until April 7, 1959, when he was certified to be mentally competent to stand trial and was re-

---

1. He admitted committing them.

2. He did not actually enter St. Elizabeths until a week after the order of commitment.

moved to the District jail. Among other things, Dr. Platkin said:

"Q. Doctor, may I ask you, in your opinion after your observation of Arthur Jones, would you tell the Court what conclusion you came to as to his mental condition on or about November 15, 1958?

"A. From my observations and studies, and from collateral information that ws made available to me, I concluded Mr. Jones was suffering from a psychoneurotic reaction of an obsessive-compulsive type.

"Q. How often did you see this defendant, Doctor?

"A. I don't know exactly how many times. I saw him a number of times for rather extended interviews personally and in addition to that, I saw him at our diagnostic conference which lasted perhaps an hour and a half or two.

"Q. Would you say this man was suffering from a mental disease in your opinion, Doctor?

"A. Definitely.

"Q. Would you say, Doctor, that this man's acts would be the product of a mental disease?

"A. That is my opinion."

Later in his testimony Dr. Platkin elaborated on this in the following colloquy:

"Q. In your opinion, Doctor, would you or would you not say that this man's acts are the product of a mental disease?

"A. May I ask which acts you are referring to?

"Q. The acts committed on November 15, 1958.

"A. Yes, it is my opinion that those acts were a product of his mental illness."

The foregoing, if it was competent,[3] unquestionably constituted "some evidence" tending to show insanity, which threw upon the Government the burden of proving as a part of its case that the appellant was sane when he committed the crimes of November 15, 1958. Accordingly, the Government introduced Dr. James A. Ryan, who had examined and observed Jones at the General Hospital during his stay there, which ended on November 15 when he escaped. Dr. Ryan testified as follows concerning the frequency and duration of his examinations of the appellant:

" * * * I examined Mr. Jones for a period of approximately 45 minutes on the 15th of October. I saw him again for about 40 minutes approximately two weeks after this time. I saw him perhaps on three or four other occasions for a period of perhaps five minutes—three or four relatively brief contacts with him, and during the period of six weeks [*sic*. This was later corrected to 30 days.], I had occasion to see him on the ward from our observation room almost daily. And perhaps I had more brief contacts with him several other occasions in making my daily ward rounds in the hospital."

As a result of these examinations Dr. Ryan formed an opinion of Jones's mental condition which he reported to the court on November 13, 1958, in the housebreaking case. Testifying in this case, he said:

"Q. And what was that opinion on November 13, 1958?

"A. It was my opinion that Mr. Jones was then of sound mind; that he was capable of understanding the charges against him; and that he was able to assist counsel in his own defense.

"Q. It was your opinion he was of sound mind?

"A. Yes, that is correct.

"Q. That was on November 13, 1958?

"A. Yes, that is correct."

3. The appellant himself in effect questions its competency in his first point on appeal, as will appear.

It will be observed that Dr. Ryan was referring to his written certificate of November 13. That his opinion extended to and through the day of the escape, November 15, is shown by his statement that

> "My diagnosis is based on more than the interviews I had with Mr. Jones; it encompasses an observation of his behavior during the entire period of time while he was in the ward."

Drs. Platkin and Ryan were the only witnesses as to the appellant's mental state on November 15, 1958. As will hereinafter appear, each testified in some detail; but the foregoing excerpts from their testimony will suffice to show they expressed diametrically opposite opinions concerning the appellant's mental condition on the day of the crimes. Judge Letts was convinced by the testimony of Dr. Ryan and found Jones guilty as charged. He appeals.

Jones was represented in this court by able counsel appointed by us, who state the points on appeal as follows:

> "1. The court below erred in failing to order a full and complete mental examination of Appellant to determine his criminal responsibility at the time of the indicted offenses.
>
> "2. In the light of the testimony of Dr. Platkin, an admittedly qualified expert, that the Appellant was suffering from a recognized mental disease at the time of the indicted offenses and that such offenses were the product of that disease, the prosecution had the burden of proving beyond a reasonable doubt that Appellant was criminally responsible at that time.
>
> "3. The prosecution did not meet its burden by the testimony of Dr. Ryan which was based on a prior examination which he had made of Appellant in another case to determine

his competence to stand trial for the prior and lesser offense involved in that case."

1. With respect to their first point, counsel rely heavily on the Winn and Calloway cases.[4] They argue that because the order of commitment of February 6, 1959, provided only for a mental examination to determine Jones's competence to stand trial, it must be concluded, as it was in the Winn case, that the examination made was for that purpose only. It is not to be assumed, appellant's counsel argue, that under such an order an examination of the type essential to a determination of criminal responsibility will be conducted. The District Court's failure to order an examination of appellant's mental condition as of the time of the crimes is said to require reversal.

It is true that in the Winn case this court concluded "that the 'complete and thorough' type of examination required for a proper determination of the issue of responsibility was never made because it had not been ordered * * *." It did not appear, however, that the examination actually conducted was an adequate inquiry into Winn's mental state at the time of his crime; and, in the absence of such information, the court concluded the examination was no more than had been ordered, and so reversed.

Obviously, however, we could not and would not have so concluded, had it appeared that the examination actually made was adequate to permit the formation of an opinion as to Winn's mental condition as of the time of the crime, regardless of the fact it had not been expressly ordered. To have done so would have been to exalt form over substance by attributing significance to the order for the examination, instead of to the examination itself.

█ Here, as in the Winn case, the commitment order was only for the purpose of determining mental competence

4. Winn v. United States, 1959, 106 U.S. App.D.C. 133, 270 F.2d 326, 328; Calloway v. United States, 1959, 106 U.S. App.D.C. 141, 270 F.2d 334. The Calloway case simply follows the holding of the Winn case.

to stand trial and St. Elizabeths' certificate to the court dealt only with that subject. But, unlike the situation in the Winn case, it affirmatively appears here that the examination actually made was not so limited in scope. It was extensive enough to permit an expert expression of opinion concerning the appellant's mental state as of November 15, 1958, when he committed the crimes charged in the indictment. This was suggested by the Superintendent's report that Jones's case had been "studied intensively" for 60 days; and it was conclusively shown by the testimony of Dr. Platkin, one of the psychiatrists who examined Jones at St. Elizabeths Hospital and testified in his behalf. Dr. Platkin gave it as his opinion, based on the examinations made pursuant to the order of which appellant now complains, that appellant had a mental disease on November 15, 1958, which caused him to commit the crimes here involved.

We will not attribute to Dr. Platkin, who was shown to be a reputable psychiatrist, a willingness to testify that Jones had a crime-causing mental disease on November 15, 1958, without having made an examination which he considered adequate for the purpose. Had it been otherwise, certainly Dr. Platkin's opinion would have been limited to mental competence to stand trial, and he would have refused to give an opinion as to the appellant's mental state on the previous November 15, on the ground that he had not examined him sufficiently to form such an opinion.

■ As the 60-day examination which began February 13, 1959, was considered by Dr. Platkin to be adequate as the basis for the expression of his expert opinion concerning appellant's mental condition on November 15, 1958, we regard it as immaterial that it was ordered only for the purpose of determining mental competence to stand trial. A defendant who relies on insanity as a defense cannot complain on appeal that the court did not expressly order a determination of mental responsibility at the time of crime but only directed an examination as to

mental competence to stand trial, if the examination actually conducted was sufficiently thorough and intensive to enable an expert to express an opinion as to defendant's mental condition at the time of the crime.

The Winn and Calloway cases are not to be read as requiring reversal of a case in which insanity was interposed as a defense merely because the order of commitment to a mental hospital was not sufficiently broad, when, as here, the mental examination actually conducted was sufficiently broad, intensive and thorough to be adequate for all purposes. It is not to be presumed or concluded that an inquiry concerning a defendant's mental state at the time of his crime was not conducted, merely because it was not ordered, if the record shows it actually was conducted.

For the reasons stated, we reject the first point advanced as a reason for reversal.

■ 2. We agree with the appellant's contention expressed in his second point on appeal: that the testimony of Dr. Platkin to the effect that the appellant's crimes of November 15, 1958, were the product of a mental disease from which he was then suffering, was sufficient evidence of insanity as of that time to cast upon the Government the burden of proving beyond a reasonable doubt that Jones was then sane. Davis v. United States, 1897, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750.

We are constrained to point out, however, that appellant's second point is a refutation of his first point or is at least inconsistent with it. For, if the examination ordered to determine mental competence was not sufficiently thorough and extensive to warrant the examiner in expressing an opinion as to the appellant's sanity on the previous November 15, then Dr. Platkin's testimony was founded on an inadequate examination and should have been rejected as incompetent.

3. We turn to a discussion of appellant's third point on appeal: that the

prosecution did not carry the burden of proving sanity on November 15. Dr. Ryan's testimony that Jones was of sound mind on that day, which was accepted by the trial judge, is criticized because it was based on an examination made in another case for the sole purpose of determining whether Jones was mentally competent to stand trial in that case.[5]

The examination conducted by Dr. Ryan was indeed ordered to determine whether Jones was mentally competent to stand trial in the earlier housebreaking case, just as the examination conducted by Dr. Platkin was ordered to determine his competence to stand trial in the present case. Their inquiries seem to have been substantially similar in character; and, as far as the nature of the examinations is concerned, both were considered by the men who made them as justifying the expression of an opinion concerning appellant's mental condition on November 15, even though both were ordered merely to determine mental competence to stand trial. The appellant cannot logically contend that Dr. Platkin's opinion was founded on an adequate examination, but that Dr. Ryan's was not.

There was a decided difference, however, in this: Dr. Platkin's testimony that Jones had a mental disease on November 15 was based on an examination which began nearly three months thereafter; but Dr. Ryan's conclusion that Jones was of sound mind on November 15 was based on an examination which began in October, 1958, and continued to the very day of the crimes—November 15. Although, as we have said, Dr. Ryan's certificate in the housebreaking case spoke only of November 13, we think his testimony in this case shows he continued his observation through November 15 and was speaking of that day as well.

The fact that Dr. Platkin's opinion that Jones had a mental disease on November 15 which caused the crimes was grounded on an examination which began nearly three months thereafter, while Dr. Ryan's opinion of sanity on November 15 arose from an examination which included that day, and the further fact that Dr. Platkin was examining and observing 600 patients while Dr. Ryan had to deal with only 40, may well have influenced the trial judge in making his decision that sanity had been established.

Moreover, although Dr. Platkin unqualifiedly said on direct examination by appellant's counsel that in his opinion the mental disease which he discerned as of the previous November 15 produced the crimes, he admitted under cross-examination that he could not determine whether the appellant's acts in attacking the attendant and escaping from the hospital were caused by a "deep-seated anxiety" which he characterized as a mental disease, or by an anxiety to escape from custody and avoid the trial for housebreaking which had become imminent because of Dr. Ryan's certificate two days earlier. Hence Dr. Platkin's unequivocal statement that there was a causal connection between the deep-seated anxiety which he diagnosed as a mental disease and the crimes which Jones committed loses its significance.[6]

5. Jones was later convicted of the housebreaking charge and appealed to this court. We remanded the case for a new trial on motion of the Government because the record did not show that a pretrial examination into his mental state as of July 29, when the housebreaking was committed, had been ordered or made. Of course this does not detract from the significance of Dr. Ryan's testimony in this case, where he dealt with Jones' mental condition as of the very day of the crimes, immediately after having examined and observed him for a period of 30 days.

6. As we have said, Dr. Platkin testified that on November 15, 1958, the appellant was suffering from a psychoneurotic reaction of an obsessive-compulsive type which caused the commission of the crimes. A psychoneurotic, he said, is one who suffers from a deep-seated anxiety. He testified, however, that Jones was no psychotic, nor was he a sociopath. On cross-examination, Dr. Platkin testified *inter alia* as follows:

"Q. Doctor, assuming that a person suffered from some type of anxiety and

The mere fact there was conflicting evidence on the issue of insanity as of November 15 does not militate against the validity of the trial judge's action in holding sanity had been established beyond a reasonable doubt. He had the task of comparing the testimony of the two witnesses, their opportunities for observing the appellant, and of deciding which opinion was convincing. In most criminal cases where insanity is pleaded, there is conflicting expert evidence on that issue of fact, which is resolved by the trier of the fact when convinced beyond a reasonable doubt.

We think the record sufficiently supports the decision of Judge Letts. As we said in Daniels v. Souders,[7] "The credibility of the testimony is within the province of the trial court who saw the witnesses and heard them speak. We cannot say that the record did not warrant the inferences and conclusions that were drawn."

Affirmed.

BAZELON, Circuit Judge (dissenting).

Appellant was indicted in another case, on July 29, 1958, for breaking and entering a grocery store. In that case the District Court, on October 13, 1958, ordered his commitment to District General Hospital for a thirty-day mental examination limited in scope to a determination of his mental competency to stand trial. On November 13, 1958, Dr. James A. Ryan, one of six Assistant Chief Psychiatrists of the Hospital, rendered an examination report responsive to the limited inquiry described in the court's order: "Psychiatric examination reveals Mr. Jones to be sane, competent, and capable of participating in his own defense."

The attack upon a hospital attendant—which is the subject of the present indictment—took place on November 15, 1958, two days after the submission of Dr. Ryan's report. In connection with this indictment, the District Court also ordered a mental examination on February 6, 1959, and again for the limited purpose of determining appellant's competency to stand trial. This time, however, the appellant was sent to St. Elizabeths Hospital. Its Superintendent reported, on April 7, 1959, that appellant "is mentally competent to understand the proceedings against him and to properly assist in his own defense."

The present case, involving the assault on the hospital attendant, was tried in April 1959. The breaking and entering case was tried in June 1959. The defense of insanity was raised in each case. Dr. Ryan testified at both trials that he

---

was incarcerated into a jail and then was put into a hospital, and further assuming that patient knew or was given knowledge he was about to be released from the hospital to go back to the jail to stand trial, and assume that he waited until an opportune moment in a hallway after having heard a door click, and assuming he had a razor hidden on his body, assume he threatened the guard, struck him with the razor, threw him down and said he would kill the guard, got the keys from the guard and left by the elevator, using the right key to open the door to the elevator. With those assumed facts, Doctor, would you say the act was a safety valve of physical safety or a safety valve action coming from this neurotic condition he had?

"A. I would tend to think that under the circumstances the need or the urge to cause such an injury was designed to relieve him of a certain degree of deep-seated anxiety.

"Q. Now, that is the injury. Now, make the assumption he was attempting and did succeed in getting outside of this institution; would you say the desire to leave, knowing he was going back to the jail, would arise from his anxiety, the deep-seated anxiety or from his anxiety to get away from the authorities?

"A. Certainly the elements of just plain escape appear to be there and I don't know whether it would be possible for me or anybody else to disassociate just where this neurotic anxiety ended and the anxiety connected with the immediate predicament began. I don't know whether I can say precisely where the line exists between these two types of feelings."

7. 1952, 90 U.S.App.D.C. 298, 300, 195 F.2d 780, 781.

found Jones of sound mind. Dr. Platkin of St. Elizabeths Hospital testified in both cases that he found Jones to be suffering from mental illness and that the alleged crimes were the product of that illness. Dr. Platkin's testimony in the breaking and entering case was supported by that of Drs. Cushard and Cody, also of St. Elizabeths.[1]

Jones was convicted in both cases and appealed them. Before hearing in the appeal from the breaking and entering conviction (Appeal No. 15327), the Government moved to remand the case solely on the authority of Winn v. United States, 1959, 106 U.S.App.D.C. 133, 270 F.2d 326; and Calloway v. United States, 1959, 106 U.S.App.D.C. 141, 270 F.2d 334,[2] which require a "complete and thorough 'type of examination * * * for a proper determination of the issue of responsibility * * *.'" 106 U.S.App.D.C. at page 135, 270 F.2d at page 328. This court granted the motion, vacated the judgment of conviction and remanded the case for a new trial.[3]

The Government has not made a similar request for remand in the present appeal notwithstanding its concession here that "the testimony in both cases of Dr. Ryan encompasses the same period of examination and the same diagnosis." It reasons that the examination in the present case was had two days before the alleged crime and "nothing would be stronger for the purposes of any case than a virtually concurrent examination by a doctor specializing in psychiatry."

The short answer to this contention, however, is that the time at which the examination is conducted is not the sole element which determines its adequacy for the issue at hand.[4] Plainly a psychiatrist's mere observation of an individual, even while he is engaged in a criminal act, would not disclose the information essential to determine his mental state on the issue of responsibility. For that purpose, an investigation of some depth is essential. Carter v. United States, 1957, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617. That is why we said in Winn: "It is not to be assumed * * * that a physchiatrist who has been ordered to prepare an opinion as to a man's trial competency will conduct the type of examination which is necessary to provide the trier of the facts with the information essential for a proper determination of criminal responsibility." 106 U.S.App.D.C. at page 135, 270 F.2d at page 328.

I do not quarrel with the majority's holding that Winn and Calloway do not require reversal where it appears that, notwithstanding the fact that the District Court orders an examination limited to trial competency, a more extensive

---

1. Thus it appears that, although the psychiatrists at St. Elizabeths found Jones competent to stand trial—i. e., to understand the charges against him and to assist in his own defense—they agreed that he was nevertheless suffering from mental illness. See Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725, certiorari denied 1958, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067.

2. Notwithstanding its sole reliance on Winn and Calloway in its motion to remand, the Government now asserts belatedly that it also had in mind "other serious questions."

3. After our mandate issued, the District Court again committed Jones to St. Elizabeths Hospital for a mental examination but this time it ordered the examination, as required by our decisions, to include the issue of responsibility.

4. Moreover, it is clear that Dr. Ryan's two interviews with the appellant took place in mid and late October, and that he formed his opinion of Jones' sanity at that time. Thus the basis for his opinion was obtained several weeks before the attack. (Dr. Ryan testified in No. 15327 that his further brief contacts did not contribute to his evaluation.) This is not as "concurrent" as the Government seems to suggest. The significance of this time lapse between Dr. Ryan's diagnosis and the attack upon the attendant relates to Dr. Cody's testimony in the breaking and entering case that appellant did not attempt to escape until it became apparent to him that he would receive no therapeutic assistance at the District of Columbia Jail.

examination is in fact performed which is adequate for the purposes of determining criminal responsibility.[5] Of course we are interested in the substance and not the form. But it is painfully obvious that the substance of an adequate examination was lacking here. We said in Winn that "In addition to the psychological and neurological tests which may be indicated, that [a proper] determination [of criminal responsibility] requires adequate knowledge and a proper expert evaluation of the accused's personal history and the circumstances surrounding the crime." Dr. Ryan's opinion was not buttressed by such information.

Dr. Ryan testified in the present case that he saw Jones for "approximately 45 minutes on October 15th * * * and again for about 40 minutes approximately two weeks after this time"; that on three or four other occasions he had "relatively brief contacts with him * * *"; and that he "perhaps * * * had more brief contacts." Dr. Ryan's testimony in the breaking and entering case (Appeal No. 15327) reveals that no psychological tests were conducted and no effort was made to obtain essential behavioral information from various institutions to which Jones had been committed, such as, the National Training School, Chillicothe Reformatory, Lorton Reformatory, and District of Columbia Jail. Nor were his Army medical records sought. No members of his family or former employers were interviewed although he advised Dr. Ryan that such persons were available in this area. Dr. Ryan sought to explain these omissions on the ground that:

"This was at a time when I was trying to establish routine evaluation by the social service department of every patient and also at a time when they were finding it utterly impossible to keep up with our turnover of approximately 50 patients a month."

And later, when he was asked if he "would say that [his] examination of Mr. Jones was not superficial?" he replied:

"Yes. I would say it was not superficial in the sense that the key to the whole diagnosis here lay in the ability to follow certain nuances and feeling which I felt were very clearly evident in this, which I have described, *this evaluation of whether or not he really felt that he had done something wrong.*" [6] (Emphasis supplied.)

Thus it plainly appears that the examination actually conducted could not bring to light the matters which we carefully described in Carter v. United States, 1957, 102 U.S.App.D.C. 227, 252 F.2d 608, as essential for a proper consideration of the issue of responsibility. The need for such information is not obviated by the fact that Dr. Ryan, in the course of his rounds through the hospital wards, had the opportunity for fleeting glimpses of Jones up to the day of the alleged assault on November 15.

Jones also argues that, since Dr. Platkin testified that Jones was mentally ill at the time of the alleged offense, the Government had the burden of establishing beyond a reasonable doubt that he

5. The majority goes on to say that Dr. Platkin's examination was adequate for the purpose of determining Jones' mental condition as of the date of the attack upon the hospital attendant. I fail to see how they can derive comfort from this fact, assuming it to be true. Dr. Platkin testified that Jones was mentally ill and that the acts for which he was indicted were the product of that illness. If the Government's case is to stand up, it must appear that Dr. Ryan's examination was adequate for the purposes for which it was used—to establish beyond a

reasonable doubt that Jones was not suffering from mental illness at the time of the offense, or that if he was mentally ill, the crime was not the product of that illness.

6. The inquiry described by the italicized portion of Dr. Ryan's testimony appears to have been the focus of his examination. In summarizing his testimony, Dr. Ryan said: "The key to my diagnosis is not in the actual details of the past history, but I will go back again to the point which you inquired about, as to whether he showed remorse."

was not suffering from such illness; and that in view of Dr. Ryan's inadequate examination his testimony is insufficient to discharge that burden. He therefore urges that we direct the District Court to enter a judgment of acquittal by reason of insanity. Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52; see Isaac v. United States, —— U.S.App.D.C. ——, 284 F.2d 168. This argument is not without substance. But the interests of the administration of criminal justice would be better served by adopting the course we followed in Winn and Calloway, namely, to order a new trial at which the issue of responsibility could be determined on the basis of "complete and thorough" examinations conducted for the purpose of illuminating that issue.

Accordingly, I dissent from the court's action affirming the judgment below.

Danaher, Circuit Judge, dissented.