**Vincent Cornell IYOTTE, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 19113.**

United States Court of Appeals
Eighth Circuit.

Nov. 7, 1968.

Certiorari Denied March 24, 1969.

See 89 S.Ct. 1214.

William F. Day, Jr., Winner, S. D., and William J. Janklow, Rosebud, S. D., for appellant.

Gene R. Bushnell, Sp. Asst. U. S. Atty., Sioux Falls, S. D., for appellee, Harold C. Doyle, U. S. Atty., was on the brief.

Before VAN OOSTERHOUT, Chief Judge, and GIBSON and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

The appellant, an Indian resident of the Rosebud Indian Reservation in South Dakota, was convicted of voluntary manslaughter in a trial before a jury for the March 26, 1967, slaying of Theodore Lawrence Black Wolf. The incident occurred within the boundaries of the reservation and federal jurisdiction is conferred through 18 U.S.C. § 1153.

Briefly stated, the evidence is as follows: On the night of the killing, Vincent Iyotte learned that his younger brother, Leroy Iyotte, had been injured in a fight with James Knife, an Indian with a history of antagonism toward the Iyotte family. Vincent Iyotte and another brother, Sylvester Iyotte, armed themselves with rifles and set out to avenge the beating. They found Knife with several other Indians near the bank of the White River which runs through the reservation. The Iyottes left their car on the highway and, rifles in hand and calling out for James Knife, began to walk towards the group on the river bank. At this point, Theodore Black Wolf, a companion of James Knife, took a tire iron from a pickup truck and, according to the testimony of the defendant, charged at Iyottes and managed to strike Vincent Iyotte on the head with the iron. Vincent Iyotte fired five shots, hitting the victim Black Wolf twice in the chest. One bullet, immediately fatal in effect, lacerated the heart and severed the aorta and another penetrated into the lung. Still another bullet entered and exited the body below the right rib cage causing a minor wound.

The appellant and Sylvester Iyotte were indicted on April 28, 1967, for first degree murder in violation of 18 U.S.C. §§ 1153, 1111, 2. Sylvester Iyotte was tried subsequent to the appellant and was acquitted. The appellant was tried before a jury in the District Court for the District of South Dakota and was found guilty of the lesser-included charge of voluntary manslaughter.[1]

Vincent Iyotte raises two issues on appeal of this conviction. First, he contends that his conviction should be set aside, as a matter of law, because the government did not sustain the burden of proof that he was sane at the time of the incident. Dr. Richard B. Leander, a qualified psychiatrist called by the defense, testified on the basis of his psychiatric examination of Vincent Iyotte that Vincent Iyotte was of below normal intelligence, and that, considering Vincent Iyotte had been drinking on the night of the killing, he probably would not be able to distinguish right from wrong as to a particular act.

Where the evidence tends to establish the insanity or mental incompetency of the defendant, the burden of proof is on the government to show be-

---

1. "(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.
Involuntary—* * *" 18 U.S.C. § 1112.

yond a reasonable doubt the defendant's sanity or mental competency to commit the offense. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895); Kaufman v. United States, 350 F.2d 408 (8th Cir. 1965), cert. denied, 383 U.S. 951, 86 S.Ct. 1211, 16 L.Ed.2d 212 (1966); Hurt v. United States, 327 F.2d 978 (8th Cir. 1964); Dusky v. United States, 295 F.2d 743 (8th Cir. 1961), cert. denied, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962).

■ In an attempt to carry its burden of proof, the government, in rebuttal, called Dr. Robert J. Murney, a clinical psychologist, and Dr. H. Wayne Glotfelty, a qualified psychiatrist, both associated with the Federal Medical Center at Springfield, Missouri, to which the defendant had been committed for examination. Dr. Murney explained the nature of the tests administered to the defendant during his stay at the Center and, among other things, evaluated Vincent Iyotte's intelligence level by a series of tests. Vincent Iyotte scored poorly on tests relying on language ability as a measure of intelligence and such tests indicated mild mental retardation. Performance tests, on which Dr. Murney relied as being a more accurate measure of intelligence for people who have been deprived of educational advantages, showed that Vincent Iyotte was of low average to average intelligence. Various test results were submitted to Dr. Glotfelty. Dr. Glotfelty testified, on the basis of intelligence, psychological and other tests and his own examination of appellant, that Vincent Iyotte knew the difference between right and wrong at the time of the incident. On cross-examination, Dr. Glotfelty stated that he could not be absolutely sure of his opinion since he was not positive of the effects of the blow allegedly received by Vincent Iyotte in the altercation with Black Wolf.[2] Dr. Glotfelty's uncertainty on

2. Dr. Glotfelty's cross-examination included the following testimony:

"Q Assuming, doctor, that the defendant was drinking on the night in question; and further assuming that during the past, the defendant's family had serious trouble with one Jimmy Knife; further assuming that prior to the night in question, Jimmy Knife shot one of the defendant's brothers in the leg; and further assuming on the night in question, Jimmy Knife brutally beat defendant's younger brother; further assuming, doctor, that on March 26, 1967, the night in question, the defendant and his brother were looking for Jimmy Knife, and that the defendant was suddenly confronted with a person who, during a struggle, hit the defendant on the head with a tire tool. Do you have an opinion, doctor, based on reasonable medical psychiatric certainty, as to whether or not the alcohol, combined with his brother's trouble with Knife, combined with the sudden struggle, contributed together to such an extent, one, assuming those things, did the defendant have the mental capacity at that time to distinguish between right and wrong? Do you have an opinion?

A I have an opinion, yes.

Q What is your opinion?

A Well, I think he did, but I couldn't say with a hundred per cent certainty.

Q Well, I'm saying based on these facts, with this hit in the head, doctor.

A Yes. You see, I couldn't say how much the hit in the head—

Q (Interrupting) Assuming he was hit on the head, dazed, and went down; can you give an opinion with reasonable medical psychiatric certainty, assuming that he was, as to his right and wrong?

A I wouldn't say. I couldn't, because I don't know his condition right at that time.

Q Well, but we're giving you—you have to answer on a hypothetical question, you see.

A I would say I wouldn't know.

Q And you wouldn't know, would you?

A No. I wouldn't say yes or no.

Q And you couldn't give an opinion one way or another, assuming these facts were true, is that right, sir?

A Yes.

Q And assuming those facts again, would your opinion be the same to the question did he have the mental capacity and reason to understand the nature and character of the act and its consequences, assuming these things again?

A Right at that moment, I wouldn't know."

cross-examination related to the assessment of non-psychiatric elements in the hypothetical question; viz., how hard was the blow and what was the effect thereof? In such a hypothetical question, the jury must determine the validity of the facts or premise used to test the expert on cross-examination. The hypothetical question asked Dr. Glotfelty to assume non-psychiatric facts with which a jury might or might not agree. The expert's failure to express an opinion thereon does not, as a matter of law, destroy his professional opinion given on direct-examination that appellant Vincent Iyotte knew the difference between right and wrong and realized and appreciated the nature and consequences of his acts. See Washington v. United States, 390 F.2d 444 (D.C.Cir.1967).

 We feel that the government carried its burden. Although the matter of sanity or insanity is often little more than a subject of speculation, albeit expert speculation, the evidence in this case afforded the jury adequate ground for believing the defendant to be sane at the time of the incident. The defendant urges to the contrary because of Dr. Glotfelty's inability to be *absolutely* sure of the defendant's condition. Although we might wish that the matter could be stated in absolutes, experience indicates that it cannot be and that the medical testimony as to sanity or insanity is an opinion as to probabilities and nothing more. Mason v. United States, 402 F.2d 732 (8th Cir. 1968); United States v. Wilson, 399 F.2d 459 (4th Cir. 1968); Beardslee v. United States, 387 F.2d 280, 295 (8th Cir. 1967); Brock v. United States, 387 F.2d 254 (5th Cir. 1967); Dusky v. United States, supra; Jones v. United States, 109 U.S.App.D.C. 111, 284 F.2d 245 (1960), cert. denied, 365 U.S. 851, 81 S.Ct. 816, 5 L.Ed.2d 816 (1961).

The appellant further argues that the trial court should have found, as a matter of law, that the killing was in self-defense and that a judgment of acquittal should have been entered. The evidence indicates that Vincent Iyotte, armed with a rifle, had sought out James

Knife after Knife had beaten Vincent Iyotte's younger brother. Black Wolf came to the defense of Knife and was killed in the effort. Vincent Iyotte claims that he did not intend to kill James Knife, that he communicated withdrawal from the entire affair to Black Wolf and further that Black Wolf had knocked him to the ground and was standing over him with the upraised tire iron. Only then was the fatal shot fired. It was properly the province of the jury to believe or disbelieve these claims and, in so doing, the jury had the right to consider the testimony of Dr. W. O. Brown, a qualified pathologist who performed an autopsy on the victim and found that Black Wolf had sustained a blow to the head and was probably unconscious at the time the fatal shot was fired.

On a review of the record as a whole, we are satisfied that the jury's finding is not contrary to, and is supported by, the evidence. Accordingly, the judgment of conviction is affirmed.