STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. SHIRLEY ANNE RISDEN, DEFENDANT-RESPONDENT.

Argued January 19, 1970—Decided April 20, 1970.

28

*Mr. Alfred O. Powell,* Assistant Prosecutor of Burlington County, argued the cause for appellant (*Mr. Martin J. Queenan,* Burlington County Prosecutor, attorney).

*Mr. Martin L. Haines* argued the cause for respondent (*Mr. James Logan, Jr.,* attorney).

The opinion of the court was delivered by

FRANCIS, J. The defendant Shirley Anne Risden was tried on an indictment which charged her with the May 31, 1967 murder of her husband Darrell Risden. The State did not demand the death penalty. The jury found her guilty of murder in the first degree and recommended life imprisonment. Following imposition of that sentence she obtained a review in the Appellate Division where the conviction was reversed for trial errors, and a new trial was ordered. *State v. Risden,* 106 *N. J. Super.* 226 (App. Div. 1969). We granted the State's application for certification. 54 *N. J.* 521 (1969). For reasons to be set forth we affirm the Appellate Division judgment but with certain modifications.

Defendant and Darrell Risden were married on December 9, 1966. It was the second marriage for both. In April 1964 Mrs. Risden left her first husband and their children in Ohio where they had been living, and came to Trenton, N. J. with Risden, who also left his wife and child in Ohio. Thereafter defendant and decedent lived together in New Jersey, at first on weekends and later full time. Their respective spouses divorced them; in defendant's case it occurred in October 1964. More than two years later, on the date mentioned above defendant and Risden married. One child was born of their relationship.

The Risdens' life together was not harmonious. At her trial Mrs. Risden testified to a number of instances of physical mistreatment and to episodes of her husband's infidelity. In April 1967, Mrs. Risden and her baby visited relatives in Cincinnati, Ohio for a few weeks. On May 25, 1967, she returned to the Bordentown, N. J. home where she and her husband were living. Several days thereafter, on May 31, 1967, at about 3:30 or 4:00 P.M. defendant and her baby visited a friend, Victoria Darnell, who confirmed defendant's suspicions that Risden had been seeing a girl

named Julie while she was in Cincinnati. Mrs. Darnell told defendant also that Risden and Julie had been to a drive-in movie with her and her husband and that she had seen them "making out," "petting real mad." Upon hearing this defendant ran out of the house carrying her baby.

A short time later Mrs. Lorraine Bulanowski, defendant's next-door neighbor, heard three shots at the Risden home. About ten minutes later defendant came into Mrs. Bulanowski's house and asked her to mind the baby for an hour. Upon inquiry defendant said she had fired the shots. Then, seemingly in a hurry, defendant ran out of the house and drove away in a car.

According to Kermit Messer, the operator of the Bordentown Atlantic automobile service station, between 4:30 and 5:00 P.M. defendant drove into his place, got out of her car and pointed a gun at a young couple seated in their car at one of the gasoline pumps. Messer asked what she was doing and she pointed the gun at him and told him to "keep [his] mouth out of her business." He testified that she was waving the gun "all over"; she was "shaking"; she had a "glassy look in her eyes — a wild look." She said she was looking for her husband (who had worked there part time). She got back in her car and as she started to drive out of the station she said she was looking for her husband and his girl friend, and Messer should tell Risden that she would "get him or shoot him."

About 5:00 P.M. Mrs. Betty W. Haun was walking on Park Street, Bordentown, passing Art's Body Works. She heard yelling, walked back and saw Mrs. Risden standing in Art's parking lot. She continued walking, then heard shots and on turning around again she saw Darrell Risden on the ground. Defendant was shaking a gun at him and telling him not to move. Defendant said also "You won't get away with it, you son-of-a-bitch." A police officer drove up and defendant told him not to get out of the car or she would shoot herself. She began to back away from her husband on the ground and started to cry. Then she put the gun

to the upper left side of her chest, fired it and fell down. When the officer reached her and took the gun, she kept repeating "let me die."

Defendant and her husband were taken to St. Francis Hospital in Trenton. There he died on the operating table. He had seven gunshot wounds. Defendant had a gunshot wound of the left upper chest below the shoulder. The next day she was transferred to the Psychiatric Ward where she remained until discharged in police custody on June 19, 1967.

## I.

At the trial the defense was "temporary insanity." It is clear from the record that defendant was not cooperative about notifying the State of that fact until a few days before the trial got under way. See generally *State v. Whitlow*, 45 *N. J.* 3 (1965). Some of the difficulties that are urged in support of the present appeal probably would have been avoided had the spirit of *R. R.* 3:5-9A (now *R.* 3:12), concerning notice of insanity plea, been observed by defendant. *R. R.* 3:5-9A became effective on October 5, 1967. It required a defendant who intended to rely upon a plea of insanity to serve notice of that fact on the prosecutor when defendant entered his plea to the indictment or within 30 days thereafter, which period could be enlarged by the trial court for good cause. Since this homicide occurred prior to the effective date of the rule and more than 30 days had expired since the plea of not guilty was entered to the indictment, defendant took the position that she was under no obligation to give notice. A trial which turned out to be abortive began on December 4, 1967. *In re Logan*, 52 *N. J.* 475 (1968). No specific notice of the insanity defense had been given. On the second day of the jury selection in that case, despite the lack of notice, the prosecutor requested permission from the court to have a psychiatric examination of the defendant. Permission was given for such an examination by Dr. H. Edward Yaskin. But because there was still

no definite statement that the insanity defense would be presented, the court ordered the report delivered to it alone, and said that it would be sealed until defendant announced that she would claim insanity. As the court indicated at the present trial when it was learned that insanity would be an issue, Dr. Yaskin's report was released to the prosecutor. Presumably through inadvertence no copy was given to defense counsel until the trial had been in progress for some days. This was irregular for fairness dictated that both sides be given copies. See *R*. 3:13–3(a) (4); *State v. Whitlow, supra,* 45 *N. J.* 3.

It should be noted for future guidance that the spirit of the rule, *R*. 3:13–3(d)(1) is to provide for mutual exchange of such reports. It is no answer for either State or defendant to say that the examining psychiatrist has furnished no written report. If the proof of insanity or sanity is to be based upon an oral report, a full statement of such oral report must be supplied in exchange for the other party's report. Since the insanity issue was exposed fully at this trial, and as will be seen hereinafter, a new trial is to be had, the matter need not be pursued any further. Defense counsel's brief contains a rather cryptic suggestion that he did not receive a copy of Dr. Yaskin's report—even at the trial. However, the record shows specifically that the original of the report was handed to counsel at his request during his cross-examination of the doctor.

Defendant testified that she had no recollection of what occurred between the time she ran out of the Darnell home until she awoke in St. Francis Hospital, except for some vague memory of leaving her baby with Mrs. Bulanowski.

In support of the claim of "temporary" insanity defendant called a single psychiatrist who was an Associate in Psychiatry at the St. Francis Hospital. He first saw Mrs. Risden on June 1, the day following her admission to the hospital. She had undergone surgery for a gunshot wound in the left upper chest, and presuming that she was suicidal he had transferred her to the psychiatric ward. She remained

there until discharged from the hospital on June 19, during which period he saw her on seven occasions. In his opinion (which he never noted on the hospital record) she had an hysterical type of personality. His final diagnosis based both on the history he obtained and on his examinations was depressive reaction, which he characterized as a type of mental disease. On discharge she had recovered from her self-inflicted wound and her depression. On being asked for his opinion as to whether at the time of the shooting she was capable of knowing right from wrong with respect to it, the doctor said "I don't think she did because she didn't remember anything during that period." Later he said, "she didn't know what she was doing and not knowing what she was doing, she couldn't have known whether it was right or wrong."

The doctor accepted as truthful her statement on June 2, 1967 that she had no recollection of events from a time just before the shooting until she "woke" up in the hospital. Obviously that testimony was essential to the opinion quoted above. He said he "had to assume" it was correct; he made no effort to determine its truthfulness. He "never" did. So he accepted as a fact that defendant's amnesia "started at the time she left her infant with a neighbor" and "ended, I believe, sometime in the Emergency Room." He did not see her there but he knew that she was attended there and that she "wasn't amnesic." It was called to the doctor's attention that within a few minutes after Mrs. Risden was brought into the emergency room, she told Sister Claire Jerome, the supervisor of that room, that she shot her husband and herself. The statement was noted on the chart immediately. Faced with this, the doctor said he believed she had been given that information on the way to the hospital from the scene of the shooting but he made no such note on the hospital record. The defendant insisted she recollected nothing until she awoke in the hospital, and she gave no testimony that anyone spoke to her on the way to the hospital from the scene of the shooting. Moreover, the

three persons who transported defendant to the hospital in the ambulance stated they had no conversation with her during the trip.

After the defense testimony on the issue of insanity had been presented, the State offered its evidence in rebuttal. Dr. H. Edward Yaskin, the neurologist and psychiatrist mentioned above, examined defendant on December 6, 1967. The doctor had studied the St. Francis Hospital records, examined the defendant and obtained a lengthy history from her which covered many years of her personal life including experiences prior to the shooting incident for which she was under the murder indictment. The history likewise included her statement that she had no recollection of shooting her husband or herself. Basically the history was substantially the same as that already voluntarily testified to by defendant and previously given to and testified to by her treating physician, Dr. English.

It may be noted at this point that defendant claims that it was improper for the prosecutor to use Dr. Yaskin's report in cross-examining defendant and Dr. English. There is no specific reference in defendant's brief, nor were we given any references in oral argument to cross-examination questions alleged to be improper because based upon the report. But assuming such use did occur, under the circumstances of the case no error was committed. Defendant and Dr. English having already voluntarily and fully testified to defendant's personal history and her version of lack of recollection of the criminal event, it was proper to cross-examine both witnesses on the basis of any conflicting statements she may have given Dr. Yaskin.

The Appellate Division intimated that the prosecutor's use of Dr. Yaskin's report for purposes of the cross-examination referred to may have transgressed the following admonition appearing in *State v. Obstein*, 52 *N. J.* 516, 531 (1968):

"A cautionary admonition must be given with regard to psychiatric examinations obtained by the State. Having in mind that the accused's statements to the doctors are admissible solely on the mental

competency issue and not at all on guilt, they cannot be used by the prosecutor as avenues of further investigation on the issue of guilt. Any inculpatory evidence derived from such a source cannot be admitted at the trial."

This statement must be read in the context of the opinion, and particularly in light of *State v. Whitlow, supra,* 45 *N. J.* 3. So read, after the claim of insanity has been made and supported by testimony, it does not stand in the way of use on cross-examination of a defendant or of defense psychiatrists with respect to statements made by the defendant to a State's examining psychiatrist on the issue of mental capacity. In addition we suggest that the *Obstein* statement was pointed primarily in a different direction. Our intention was to advise the State that it could not use factual information obtained from a defendant in the course of a psychiatric examination as a lead for further investigation of the issue of guilt. For example, if on such examination a defendant in a shooting death informs the State psychiatrist that he hid the gun at a certain place, and on the basis of such information the prosecutor thereafter goes to that place and finds the gun, it might be argued that the gun would not be admissible in evidence in the State's case at the trial. We need not decide that question on this appeal.

Returning to Dr. Yaskin's testimony at the trial, he testified on the basis of his examination and the facts given to him in the State's hypothetical question that, in his opinion, at the time of the shooting the defendant did not have "any defect of reason" or any "disease of the mind." He said further that she did not have a real amnesia nor was she out of contact with reality at the time. In addition he expressed the view that there is no such mental disease as reactive depression. A reaction of depression is not a disease, it is a "mood of disturbance."

The State also produced Dr. Julio C. Del Castillo on the insanity aspect of the defense. The Appellate Division found that prejudicial error had been committed by the trial court in allowing the doctor to give rebuttal testimony bearing

upon defendant's claim of mental incapacity at the time of the shooting. We cannot agree.

Dr. Del Castillo came into the case under unusual circumstances. While defendant was in jail awaiting trial, the trial judge was informed that she was acting strangely. Thereupon on notice to the State and the defense the judge ordered a complete mental, physical and neurological examination "to determine her ability to stand trial and cooperate with counsel." The order recited that it was made pursuant to the provisions of *R. S.* 30:4–82 which broadly authorized the appropriate court to "determine the mental or physical condition" of a person under commitment, indictment or sentence. Compare *N. J. S. A.* 2A:163–2; *State v. Whitlow, supra,* 45 *N. J.,* at 10–14; *Aponte v. State,* 30 *N. J.* 441 (1959). As a result, on February 29, 1968 Mrs. Risden was transferred to the State Hospital at Trenton where Dr. Del Castillo was a staff psychiatrist.

The doctor examined and interviewed her on March 1 and thereafter saw her daily until she was returned to jail on March 22, 1968. He testified that on his first visit she appeared to have a good memory and no memory defects "whatsoever." After his examinations, interviews and daily observations he concluded she showed no sign of any mental disease. In the course of his interviews he questioned her on more than one occasion with regard to the events of May 31, 1967. Her memory on the subject was good. The doctor said also that on March 21 he interviewed her in front of the hospital staff under the supervision of Dr. Berg, the staff director. The record made by Dr. Berg in his presence revealed that defendant had no evidence of psychosis during her stay at the hospital.

In declaring that admission of Dr. Del Castillo's testimony was improper, the Appellate Division noted that the trial court transferred defendant to the State Hospital for examination as to whether she had the mental capacity to stand trial. Therefore, it said that since the defense did not contend Mrs. Risden lacked mental ability to stand

trial, the doctor should not have been called at all; allowing him to give testimony which was susceptible of the inference that since defendant was sane at the time of trial, she probably was also sane at the time of the murder, was "patently prejudicial" to her cause.

■ Ordinarily when an order is made which purports to limit the scope of a psychiatric examination to the issue of competency of a defendant to stand trial, the defendant is entitled to rely upon such limitation in the absence of notice to the contrary. But where the examining psychiatrist in good faith in pursuing the purpose of the order engages in a sufficiently comprehensive and protracted examination which as an undesigned incident thereof enables him to form an opinion as to sanity at the time of the alleged crime, the trial court in its discretion may permit the doctor to give his conclusions on both aspects of the defendant's mental competency.

On this point we find ourselves in agreement with the exception to the general rule noted by the Court of Appeals for the District of Columbia Circuit in *Jones v. United States*, 109 *U. S.* App. D. C., 111, 284 *F.* 2d 245 (1960). There the court noted that Jones was ordered examined "only for the purpose of determining mental competence to stand trial and St. Elizabeth's certificate to the court only dealt with that subject."

It appeared that Jones was in the hospital for about 30 days. One psychiatrist who examined him pursuant to the court order in testifying to the extent and frequency of his examinations, said:

"I don't know exactly how many times. I saw him a number of times for rather extended interviews personally and in addition to that, I saw him at our diagnostic conference which lasted perhaps an hour and a half or two." 284 *F.* 2d at 247.

The Court of Appeals sustained the admission of the doctor's opinion as to whether defendant was suffering from a mental disease and whether his criminal conduct was

the product of that disease. It pointed out that the evidence affirmatively showed that although the examination was ordered to determine capacity to stand trial, the actual examination was not "so limited in scope."

The Court said:

"As the 60-day examination which began on February 13, 1959, was considered by Dr. Platkin to be adequate as the basis for the expression of his expert opinion concerning appellant's mental condition on November 15, 1958. we regard it as immaterial that it was ordered only for the purpose of determining mental competence to stand trial. A defendant who relies on insanity as a defense cannot complain on appeal that the court did not expressly order a determination of mental responsibility at the time of crime but only directed an examination as to mental competence to stand trial, if the examination actually conducted was sufficiently thorough and intensive to enable an expert to express an opinion as to defendant's mental condition at the time of the crime." 284 *F.* 2d at 249.

In our judgment Dr. Del Castillo's study of defendant at the hospital was sufficiently comprehensive to justify receiving his full opinion. It should be noted also that unlike the psychiatrist in *Jones v. United States, supra,* the doctor did not express a conclusion as to whether defendant at the time of the shooting was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of her act, or if she did know it, that she did not know that what she was doing was wrong. See *Aponte v. State, supra,* 30 *N. J.,* at 450. His testimony was limited to his view that she had a good memory with regard to the shooting event, and that she was not suffering from any psychosis during her stay at the hospital. Under all the circumstances it is our opinion that no prejudicial error was committed in accepting Dr. Del Castillo's testimony.

In concluding the general discussion of the medical testimony in the case we feel obliged to observe that a more definitive exploration of the insanity defense by both defendant and the State would be helpful in resolving the claim. See *State v. Obstein, supra,* 52 *N. J.,* at 529; *State*

v. *Vigliano*, 43 *N. J.* 44 (1964); *Aponte v. State, supra;
State v. Lucas*, 30 *N. J.* 37 (1959); *State v. Aeschbach*, 107
*N. J. L.* 433, 436–437 (E. & A. 1931); *State v. Bell*, 102
*N. J. Super.* 70, 72–75 (App. Div. 1968), certif den. 52
*N. J.* 485 (1968), cert. den. 394 *U. S.* 911, 89 S. Ct. 1026,
22 *L. Ed.* 2d 223 (1969); *State v. Carrigan*, 93 *N. J. L.*
268, 272 (Sup. Ct. 1919), aff'd 94 *N. J. L.* 566 (E. & A.
1920).

## II

■ On this appeal the State further contends that the
Appellate Division erred in holding that the trial court
should not have excluded certain lay witnesses' testimony
relating to defendant's physical appearance and her mental
and emotional attitude and reactions within minutes be-
fore, at the time of, and after the shooting. More particu-
larly, the various witnesses were not allowed to testify that
defendant acted "crazy," "was in a rage," and was "shaking
all over"; that she looked, "wild, mad. I was afraid to talk
to her. No telling what she would do. Just wild, crazy."
Nor was a witness allowed to answer whether defendant ap-
peared to know him (the proof showing that they were
acquaintances), or to state that defendant appeared "hyster-
ical" or acted hysterically, or how she looked at the time.
This proof was rejected as constituting a conclusion.

We thoroughly agree with the Appellate Division that
such evidence should have been admitted. Lay-witness opin-
ion of the type described requires no expertise. It springs
from the common understanding and experience of man-
kind. It represents the reaction of an ordinary man aris-
ing from his observation and is helpful to an understand-
ing of his testimony and an appreciation of the mental or
emotional state of the person described. *Rule* 56(1), *N. J.
Rules of Evidence; Dwyer v. Ford Motor Co.*, 36 *N. J.* 487,
501 (1962); *Clifford v. State*, 60 *N. J. L.* 287, 289 (Sup. Ct.),
aff'd 61 *N. J. L.* 217 (E. & A. 1897); *Genz v. State*, 58
*N. J. L.* 482 (Sup. Ct.), aff'd 59 *N. J. L.* 488 (E. & A.

1896); *Hall v. Centolanza,* 28 *N. J. Super.* 391, 399 (App. Div. 1953); *Gretowski v. Hall Motor Express,* 25 *N. J. Super.* 192, 196 (App. Div. 1953); 7 *Wigmore, Evidence* (3 ed. 1940), § 1974, pp. 113–18.

## III

We have examined the other grounds of appeal argued briefly by defendant. They were dealt with adequately by the Appellate Division, and we affirm the disposition there.

For the reasons stated the judgment of the Appellate Division is affirmed as modified.

*For affirmance as modified*—Chief Justice WEINTRAUB and Justices JACOBS FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.