JOSEPHINE W. LEYENDECKER, complainant-respondent,

*v.*

HERMAN W. LEYENDECKER and HENRIETTA KOERNER,
defendants-appellants.

[Submitted February 13th, 1948.   Decided May 13th, 1948.]

*Mr. Frank F. Neutze,* for the appellants.

Messrs. *Norcross & Farr* (*Mr. Frank S. Norcross,* of counsel), for the respondent.

The opinion of the court was delivered by

HEHER, J.

The decree under appeal construes the will of Peter J. Leyendecker, who died on July 9th, 1926, survived by his wife, Mary A., and three children, the complainant, Josephine W., and the defendants, Herman W. Leyendecker and Henrietta Koerner.

When the will was made, December 29th, 1925, and also at the time of his death, the testator was the owner of 970 of the outstanding 1,000 shares of the capital stock of the Haddon Ice and Coal Company, a prosperous retailer of ice and coal, principally ice of its own manufacture; and he was also the owner of his place of residence, adjoining the company's plant, and securities and other personal property of considerable value. Although there is some doubt as to when the certificates were actually issued, each of the testator's three children held 10 shares of the remainder of the issued stock of the corporation.

The testator devised and bequeathed his entire estate to his wife for life, and, upon her death, a life estate to his complainant daughter, Josephine, in his "home and the grounds surrounding it and the free use thereof, as well as garage space for her automobile." He provided that "all the expenses connected with the maintenance of the said home be borne by the Company before distribution of any dividends," and that "the sum of $60 per week be paid" to his daughter Josephine "from the profits of the said Company, being the Haddon Ice and Coal Co., before distribution of dividends upon stock or otherwise, and said $60 is to be in addition to any earnings on stock which may be held" by Josephine "under the next succeeding clause" of the will, which clause directed that all his property and estate, except the life estate given to Josephine, "be divided into three equal parts and distributed unto" his three children, Henrietta, Josephine and Herman, "share and share alike." And he then provided

that, upon Josephine's death, "the home and grounds and garage space" given to Josephine for life "is to revert to the Haddon Ice and Coal Co. in fee simple." The three children were appointed executors of the will, with power of sale of the real estate. This summarizes the entire testamentary expression.

All three executors qualified; and their final account was allowed on May 20th, 1928.

The ice and coal business was established by the testator a quarter of a century before the will was made. Each of his daughters assisted him at times in the management of the enterprise. Herman and Henrietta's husband, Charles T. Koerner, were in his employ, the latter from the day trade was commenced. In March, 1923, the corporation was organized, and the business was eventually transferred to it, in consideration of the issuance of 970 shares of the capital stock to him and, presumably, ten shares each to his three children. Josephine made a trip to Germany with her father in 1911, and returned a semi-invalid. She was 33 years old and unmarried when her father died and, it would seem, a chronic invalid; and there is no doubt that her condition made her the special object of paternal solicitude. The ultimate question is how far her father intended to go, as revealed by the language of the will, in providing for his ailing daughter.

Upon the testator's death, Herman assumed the management of the business. His and Koerner's salaries were increased from $70 to $100 per week. Following the death of the testator's widow, August 6th, 1929, there was an equal division of the corporate stock among the three residuary legatees; and all the rest of the personal property was made the subject of a trust for the benefit of all three residuary legatees. The corporation was deficient in cash reserve; and the assets of the trust were used as a substitute for the ordinary liquid reserve, even as the testator's personal estate was used as such during his lifetime. This was the primary, if not indeed, the sole purpose of the trust. The trustees were Charles T. Koerner and Herman, who became, respectively, the president and the secretary and treasurer of the corpora-

452

tion. At one time, the trust's loans to the corporation totaled $60,000. Thereafter, all three residuary legatees served on the corporation's board of directors.

From October 12th, 1929, until March, 1930, the corporation paid Josephine $60 per week, and Herman and Koerner each $100 per week. During the remainder of the year 1930, all of 1931, and the first six months of 1932, Josephine was paid $120 per week, and Herman and Koerner each $200 per week. The weekly payments to all three were thereafter reduced from time to time; and from February 1st, 1941, to September 29th, 1944, Josephine received but $35 per week, and Herman and Koerner each $90 per week. From then on, Josephine was paid $48 per week. The payments to Josephine were treated as salary on the company's books; but it is clear that she rendered no service which would give the payments a compensatory character. Plainly, in part at least, these were disbursements in keeping with the testamentary command.

Due to adverse trade conditions, chargeable in large part to the general home use of mechanical refrigeration, there was a radical curtailment of corporate earning power which, for eleven successive years, resulted in substantial operational deficits; and this is assigned as the reason for reducing Josephine's weekly payments below the sum fixed by the will. There were annual net losses from 1932 to 1942, inclusive, aggregating in excess of $47,000. The net loss for 1941 and 1942 exceeded $22,000. There was a net profit of $600 in 1943 and $1,200 in 1944. No dividends were declared during this period of financial stress. The decline in trade was not reasonably foreseeable at the time of the testator's death. The manufacture of ice constituted between 85% and 90% of the corporate business; and the unforeseen development of artificial refrigeration rendered the plant obsolete and made it necessary to introduce substitute facilities to the trade and to reconstitute the business to meet the altered conditions.

We have recounted the circumstances at some length because, if relevant at all on the inquiry of intention, their significance in our view is not that perceived by the learned Vice-Chancellor. The Vice-Chancellor, invoking the interpretive principle of the case of *Noice* v. *Schnell, 101 N. J. Eq.*

*252, 272,* conceived that the testator's "predominant idea" was that the "homestead should continue to be the home of his wife and dependent daughter, that it should be maintained as he had maintained it, and that his daughter should have an assured income of at least $60 per week;" that if a testator, "during his lifetime, has had and exercised complete control of a corporation and has acted as if its property was beneficially owned by him, a general legacy to one which, as the testator knows, can be paid only out of the assets of the corporation, will be so paid, even though he has bequeathed the stock in the corporation specifically to another," and therefore the particular testator's children received his gift of the stock "burdened with the obligations he had imposed," and the gift to Josephine falls into the category of a demonstrative legacy.

The decree adjudges, *inter alia,* that the bequest to Josephine embodied a demonstrative legacy, "to be paid in weekly installments of $60 during her lifetime out of either the earnings or capital funds" of the corporation; and that it was the testator's intention "to charge, and he did so charge, the payment" of the legacy "upon his residuary estate," including the capital stock of the corporation, and that his three children and residuary legatees "became trustees of his residuary estate" for Josephine's benefit, "to the extent necessary to make said payments." Direction was given to the residuary legatees to pay to Josephine, "from either the earnings or capital funds" of the corporation, a sum equal to the total of past weekly deficiencies without any offset or diminution for individual payments in excess of the weekly rate. This view of the will is challenged; and we think the challenge is well founded.

The construction of a will is a function judicial and interpretive in nature and not legislative or creative. The judicial province is to find the testator's meaning as revealed by the language used, considered in the light of the attendant circumstances, and to effectuate the intention so found. If the testamentary purpose is defined in clear and unequivocal terms, there is no room for construction. Construction itself is the ascertainment of the testator's expressed intention.

Unless the context unmistakably shows an intention *contra*, the words of a testamentary disposition are to be given their primary or ordinary sense. Canons of construction are in aid of the testamentary intent; and they have no bearing where the testator's design is declared in certain and unambiguous terms. *In re Fisler, 133 N. J. Eq. 421; American National Bank of Camden v. Morgenweck, 114 N. J. Eq. 286; McDonald v. Clermont, 107 N. J. Eq. 585.* It is not of the judicial function to supply a provision for an eventuality that, for want of forethought, was not within the contemplation of the testator.

The will in certain and definite terms directs the payment of the income legacy "from the profits" of the company "before distribution of dividends upon stock or otherwise." These are terms of limitation that in their ordinary and normal sense and significance plainly exclude the corporate capital fund as the source of the payments. A legacy of income is not payable out of the *corpus* unless the testator expressly so provides. The contrary doctrine might very well substantially impair or perhaps destroy the capital fund in a time of adversity, and thus the testator's scheme of continuing weekly payments to his invalid daughter would be frustrated. Bear in mind that Josephine was also given a one-third interest in the *corpus* and also in the considerable personal estate that became the subject of the trust. The trust, by the way, was terminated and the assets ordered distributed by a decree in a contemporaneous proceeding in Chancery instituted by Josephine; and there has been no appeal from that decree.

There is no reason to suppose the testator contemplated the failure ever of a corporate profit yield sufficient to satisfy the income legacy to Josephine. The earnings of the business were more than ample to allay fears in this regard. Indeed, the Vice-Chancellor declared that it "cannot be doubted" that the testator "believed his business would continue to provide reasonable salaries to his son and son-in-law, and profits sufficient to maintain his homestead as he had maintained it, support his widow, allow Josephine at least $60 per week and, in addition, pay to each of his three children

dividends on the stock he was giving them;" and thus the Vice-Chancellor sought to make provision for a contingency which he found the testator did not have in mind at all, and to amplify the will to carry out what he arbitrarily found was the unexpressed intention.

The income legacy is in its nature akin to the specific and not demonstrative. It is deficient in the essential attribute of the demonstrative legacy, *i. e.,* an intention to render it payable out of the general assets should there be a failure of the particular fund designated as the primary source of payment. There was no intention to give an annuity payable at all events out of the testator's estate at the expense of the residuary legatees. *Walsh* v. *Brown, 43 N. J. L. 27; Johnson* v. *Conover, 54 N. J. Eq. 333; Hopkins* v. *Remy, 64 N. J. Eq. 12; Kling* v. *Van Cleeve, 106 N. J. Eq. 302; First National Bank of Toms River* v. *Levy, 123 N. J. Eq. 21.*

As we read appellants' brief, the only criticism of the provisions of the decree relating to the maintenance of the homestead is that the proofs do not sustain the direction for a "complete repairing and reconditioning" of the property.

We find no merit in this assignment.

The corporation was not made a party to the suit; but we shall not disturb the decree on that account. It is enough to say that a corporate entity is not bound by a decree affecting its property or interest in a judicial proceeding to which it was not a party and thus denied an opportunity to be heard.

The decree is accordingly reversed in part and affirmed in part, with costs; and the cause is remanded for further proceedings not inconsistent with this opinion.

*For affirmance*—WACHENFELD, J. 1.

*For reversal*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, COLIE, EASTWOOD, BURLING, WELLS, DILL, FREUND, McLEAN, SCHETTINO, JJ. 12.