944 A.2d 588

IN THE MATTER OF THE TRUST CREATED BY AGREEMENT DATED DECEMBER 20, 1961, BY AND BETWEEN JOHN SEWARD JOHNSON, GRANTOR, AND PHILIP B. HOFFMAN, GUSTAV O. LIENHARD AND KENNETH PERRY, TRUSTEES (KNOWN AS THE JOHN SEWARD JOHNSON 1961 CHARITABLE TRUST).

Argued September 25, 2007—Decided April 3, 2008.

*Joseph C. Mahon* argued the cause for appellants *Eric B. Ryan and Hillary A. Ryan* (*Cooper Levenson April Niedelman & Wagenheim,* attorneys; *Mr. Mahon* and *Gerard W. Quinn,* on the briefs).

*Eugene M. Purcell* argued the cause for appellant *Joseph R. Purcell,* Guardian Ad Litem for the minor Great Grandchildren of *John Seward Johnson (Purcell, Ries, Shannon, Mulcahy & O'Neill,* attorneys; *Michael F. O'Neill* and *Joseph R. Purcell,* on the briefs).

*Richard F. Collier, Jr.,* argued the cause for appellant *Roderick Newbold Ryan (Collier & Basil,* attorneys).

*Alan S. Naar* argued the cause for respondent *Martin Richards (Greenbaum, Rowe, Smith & Davis,* attorneys; *Mr. Naar* and *Olivier Salvagno,* on the brief).

PER CURIAM.

This case involves the interpretation of the word "spouses" as used in a 1961 charitable trust settled by J. Seward Johnson of the Johnson & Johnson Company family. Martin Richards, the widower of Johnson's daughter Mary Lea Johnson, argues that he satisfies the definition and thus qualifies as a potential beneficiary of the trust. The trial judge ruled in favor of Richards, and, over a dissent, the Appellate Division affirmed that judgment.

Roderick Newbold Ryan, Joseph R. Purcell, Eric B. Ryan, and Hillary A. Ryan (the heirs) appeal, as of right, from the Appellate Division's decision, contending that the record does not support the trial judge's conclusion that the word "spouses" was intended to include widowers like Richards. We have carefully reviewed the claims advanced by the heirs and have determined that they are unavailing. The record fully supports the trial judge's findings and conclusions. We therefore affirm, substantially for the reasons expressed by the Appellate Division majority, *In re John Seward Johnson 1961 Charitable Trust,* 399 *N.J.Super.* 237, 944 *A.*2d 33 (App.Div.2006).

I

The facts of the case are detailed in the Appellate Division opinion and are incorporated here as if more fully set forth. For our purposes, it is sufficient to note that between 1939 and 1963

Johnson created a series of trusts to benefit his family members. At issue is the December 20, 1961, irrevocable charitable trust (the 1961 trust), naming four of Johnson's six children, their spouses, and his eleven grandchildren as beneficiaries. The 1961 trust was an estate planning device to save taxes. According to the trust instrument, for a thirty-five-year charitable phase, all net income was to be distributed to "educational, religious, and charitable organizations." After the charitable phase ended, the income and corpus could be distributed to the beneficiaries at the "absolute and uncontrolled discretion" of the trustees. In naming the beneficiaries, the trust used the following language regarding the distribution of the corpus:

After January 10, 1997, and for so long as this Trust shall be in existence, from time to time, and whenever in the absolute and uncontrolled discretion of the Trustees they deem it to be for his or her best interests, to *use for or to distribute and pay over to and among the Grantor's four children, MARY LEA JOHNSON RYAN, ELAINE JOHNSON WOLD, JOHN SEWARD JOHNSON, JR., and DIANA MELVILLE JOHNSON STOKES, their spouses, and their issue, or any one or more of them,* in such shares as the Trustees may determine, to be his or hers absolutely, outright, and forever, and any or all of the Trust Property. [ (Emphasis added).]

The testamentary language authorizing the trustees to distribute income is almost identical, naming the Johnson children, *"their spouses,* and their issue, or any one or more of them" as beneficiaries. Nowhere in the trust is the word "spouses" defined.

In 1990, Mary Lea Johnson died, survived by her third husband, Martin Richards, and six children. In 1995, the trustees of the 1961 trust commenced a ninth accounting of the trust in anticipation of distributing the interest and corpus to the beneficiaries after the charitable phase ended. James Scott Hill, the scrivener of the trust and a trustee, believed that Richards continued to be a beneficiary of the trust despite his wife's death. The other trustees, however, disagreed. They thought that Johnson's failure to use the phrase "surviving spouses" indicated that he did not intend to include widows and widowers as beneficiaries. The trustees nonetheless acknowledged that it was possible to interpret the trust as including widowers, and as a result, they sought

judicial guidance regarding the construction of the trust in March 1996.

After years of trials and appeals,[1] a plenary hearing was held in April 2003 regarding Johnson's probable intent with respect to surviving and divorced spouses. The trial judge heard and assessed extrinsic evidence to ascertain the meaning of the ambiguous word "spouses." That evidence included Johnson's overall testamentary scheme; his direct involvement in creating the trust; and testimony from the parties and the scrivener, Hill. The judge gave substantial credence to Hill's testimony, which he found "reliable, trustworthy, and very credible." On the basis of all of the evidence, he ruled that surviving spouses were intended to be included as "spouses" but that persons divorced from Johnson's legatees were not.[2] The Appellate Division affirmed the trial judge's ruling over the dissent of one judge.

## II

The bone of contention between the appellate majority and the dissent was the testimony of the scrivener, Hill. Because the trust was ambiguous regarding the meaning of the word "spouses," it is uncontroverted that portions of Hill's testimony as scrivener were admissible. Indeed, we recently reiterated the standards for will

---

[1] In December 1996, the trial judge found "spouses" to be unambiguous on its face and concluded that, under its plain meaning, the term did not include surviving spouses. The Appellate Division unanimously reversed, determining the term "spouses" to be ambiguous within the context of the trust. The panel held that the intent of the settlor could not be ascertained without examining extrinsic evidence and remanded the case for the trial judge to conduct a plenary hearing. The case eventually reached us but only on an unrelated question. *In re Trust Created December 20, 1961*, 166 *N.J.* 340, 765 *A.2d* 746, *cert. denied sub. nom. Ryan v. Johnson*, 534 *U.S.* 889, 122 *S.Ct.* 203, 151 *L.Ed.2d* 143 (2001).

[2] William A.K. Ryan, the spouse of Mary Lea Johnson until their divorce in 1972, had alleged that he remained a "spouse" within the meaning of the trust. The Appellate Division unanimously rejected his argument, and his appeal to this Court was dismissed. We therefore do not address that contention in this opinion. *R.* 2:2–1(a)(2).

interpretation in *In re Estate of Payne,* a case in which we allowed a scrivener to testify:

> In interpreting a will, our aim is to ascertain the intent of the testator. When we say we are determining the testator's intent, we mean his probable intent. We continue to adhere to the view of the doctrine of probable intent expressed in *Fidelity Union[ Trust Co. v. Robert,* 36 *N.J.* 561, 178 *A.*2d 185 (1962) ]. In that case, the Court stated that in determining the testator's subjective intent, courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances. The trial court should ascribe to the testator those impulses which are common to human nature and ... construe the will so as to effectuate those impulses. More recently, this Court emphasized that courts are enjoined to strain toward effectuating the testator's probable intent to accomplish what he would have done had he envisioned the present inquiry.
>
> The trial court is not limited simply to searching out the probable meaning intended by the words and phrases in the will. Extrinsic evidence may furnish information regarding the circumstances surrounding the testator and should be admitted to aid in ascertaining the testator's probable intent under the will. To be sure, the testator's own expressions of his or her intent are highly relevant. Once the evidence establishes the probable intent of the testator, the court may not refuse to effectuate that intent by indulging in a merely literal reading of the instrument.
>
> [186 *N.J.* 324, 335, 895 *A.*2d 428 (2006) (internal quotations and citations omitted); *see also Restatement (Third) of Prop.: Wills and Other Donative Transfers* § 10.2 (2003) ("In seeking to determine the donor's intention, all relevant evidence, whether direct or circumstantial, may be considered, including the text of the donative document and relevant extrinsic evidence.").]

Both the majority and the dissent recognized that, to the extent that Hill related his testimony to the particularized circumstances surrounding the creation of the trust, including statements and conversations with Johnson, such testimony was relevant and admissible. *See Engle v. Siegel,* 74 *N.J.* 287, 295–96, 377 *A.*2d 892 (1977) (relying on scrivener's testimony regarding testator's specific declarations of intention); *Wilson v. Flowers,* 58 *N.J.* 250, 262, 277 *A.*2d 199 (1971) (declaring direct statements of intention by testator admissible under doctrine of probable intent).

Where the members of the panel parted company was in connection with Hill's testimony regarding his "understanding," "impression," "thinking," "belief," or "feeling" about Johnson's intent, untethered to any expression or action of Johnson himself. The dissent opined that to the extent Hill's testimony regarding

Johnson's intent was not based on direct statements or other actions by Johnson, it was inadmissible under our rules of evidence.

■ The admissibility of such opinion testimony is governed by *N.J.R.E.* 701:

If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.[3]

Pivotal to the admissibility of *N.J.R.E.* 701 evidence is perception acquired through the senses. *See Priest v. Poleshuck*, 15 *N.J.* 557, 562–63, 105 *A.*2d 541 (1954) (holding only facts perceived by use of senses, and not mere opinions, inferences, or conclusions, admissible). Thus, *N.J.R.E.* 701 permits lay witness testimony regarding common knowledge based on observable perceptions, such as whether someone was intoxicated, *State v. Shiren*, 9 *N.J.* 445, 455, 88 *A.*2d 601 (1952), exceeding the speed limit, *Pierson v. Frederickson*, 102 *N.J.Super.* 156, 161–63, 245 *A.*2d 524 (App.Div. 1968), or appeared "wild, mad ... [and] crazy," *State v. Risden*, 56 *N.J.* 27, 40–41, 264 *A.*2d 214 (1970). We have never interpreted *N.J.R.E.* 701, nor do we elect to do so today, as sanctioning a lay witness's opinion about the unspoken thought processes of another.

■ Hill freely admitted that he could not recall Johnson ever telling him directly that he wanted surviving spouses to benefit under the trust. The trial judge nonetheless allowed him to express his opinion that he "certainly *thought* [it] was [Johnson's] objective" to include surviving spouses as beneficiaries. Hill was also allowed to comment that "it was [his] *understanding* that [Johnson] wanted to include surviving spouses" as beneficiaries, that it was his "*understanding* of Mr. Johnson's intent regarding the term spouses ... that it included surviving spouses," and that

---

[3] Neither party argues that, in offering his understanding of Johnson's unspoken thoughts, Hill provided expert opinion testimony based upon any "knowledge, skill, experience, training, or education." *N.J.R.E.* 702.

"it was certainly [his] *impression* that in Johnson's mind, the word 'spouses' included widows and widowers." Clearly, those expressions by Hill, which were not based on particular conversations with Johnson or observations of Johnson's conduct, were surrogate ways for Hill to convey his own ideas on that subject. Those ideas were not declared by Hill to be based on any perception and are "obviously a conclusion by supposition by a lay witness who has no greater skill than the [trier of fact] in drawing inferences." *Priest, supra*, 15 *N.J.* at 563, 105 *A.*2d 541. As a result, we agree with the dissent that some of Hill's testimony was inadmissible.

 Ordinarily, we would remand the case to the trial judge for review of the record without the interdicted evidence and for further hearings if warranted. However, the trial judge is retired and is unavailable to review this record. Moreover, Hill, unfortunately, has died, thus rendering further plenary proceedings impossible. In the interest of finality, therefore, we have chosen to excise the inadmissible portions of Hill's testimony and evaluate whether the record that remains supports the trial judge's decision regarding the meaning of the word "spouses."

## III

 Our careful canvas of the record leads us to conclude that, when Hill's offending statements are removed, there is ample evidence to support the trial judge's determination. In ruling,

> we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice, and the appellate court therefore ponders whether, on the contrary, *there is substantial evidence in support of the trial judge's findings and conclusions.*
>
> [*Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) (emphasis added) (internal quotation and citations omitted).]

Thus, we defer to the trial judge's assessment of Hill as "reliable, trustworthy and very credible," and credit those portions of his testimony that were based upon specific conversations and interactions with Johnson. For example, during his three-and-

one-half days of testimony, Hill recounted many discussions with Johnson including those that involved Johnson's lamentations over the "vicissitudes" or uncertainties of life for which he wished to make provisions. In one particular conversation, Johnson discussed the plight of a widow who was bequeathed little money from her spouse's will, but whose minor children were well provided for. Johnson stated his belief that such a situation "must be a terrible thing to happen to *a family* " and said essentially, "don't let that happen to me." Hill considered those direct expressions as evidence of Johnson's expansive vision of family and as supportive of the notion that he considered widows and widowers (unlike divorced spouses who were "outside the family") as included in the term "spouses."

■ Noteworthy as well was Hill's testimony that he used the word "spouses" in the 1961 trust because he viewed the term "surviving spouse" as a "redundancy" and considered that "a spouse and a surviving spouse were synonymous." Unquestionably, a scrivener's rationale for selecting certain language when drafting a will is relevant testimony. *See Flowers, supra,* 58 *N.J.* at 259, 277 *A.*2d 199 (permitting scrivener to testify his use of "philanthropic" was meant merely to avoid repeating "charitable" within same sentence).

Hill's sense of redundancy derived from his review of earlier trusts. In 1939, Johnson created four irrevocable trusts, one for each of the children of his first marriage. By way of example, in the trust created for Diana Melville Johnson, the testamentary language expressly referred to her husband as a potential surviving spouse beneficiary:

Upon the death of said Diana Melville Johnson [the Trustee will] transfer and pay over the then remaining Trust Property to *her husband* and issue or any of them in such shares absolutely or with limitations and subject to such lawful trusts and conditions as she may direct by her Last Will and Testament duly admitted to probate, or failing such testamentary direction then ... to those persons, other than the Grantor, who under the laws of New Jersey then in force would have been entitled to inherit from said Diana Melville Johnson....

[ (Emphasis added).]

Likewise, trusts created in 1944 were formulated for the benefit of all six of Johnson's children. The language of those trusts directly identified surviving spouses as potential beneficiaries:

> [The trustees shall,] upon the death of [Johnson child] divided, transfer, and pay over absolutely, outright and forever, the Trust Property ... *to the surviving spouse and issue* of [Johnson child], or any of them in such shares as she may direct by her Last Will and Testament duly admitted to probate.
>
> [ (Emphasis added).]

Although created after the 1961 trust, in the 1963 charitable instrument, the word "spouse" was used to refer to a surviving spouse:

> [U]pon the death of the child for whom each such Trust was created, [the trustee shall] divide, transfer, and pay over, absolutely, outright, and forever, the then remaining Trust Property ... to and among *the spouse,* issue, brothers, and sisters of such child, in such shares as such child may direct by his or her Last Will and Testament duly admitted to probate.
>
> [ (Emphasis added).]

Together, in those trusts, Johnson used the words "surviving spouse," "spouse," and "husband" as interchangeable references to the widows or widowers of his children and grandchildren. We note that the statute in existence at the time of the preparation of the 1961 trust also used the words "husband or widow" as a substitute for "surviving spouse" in naming intestate beneficiaries. *See N.J.S.A.* 3A:4-2 (repealed *L.* 1977, *c.* 412; *L.* 1978, *c.* 30). Given the previous donative documents and the statute, sufficient evidence existed to support Hill's belief that words like "husband," "wife," and "spouse" incorporated surviving spouses, such that he did not need to make that explicit within the 1961 trust. As the trial judge concluded, Hill's testimony, including his recollection of Johnson's expansive vision of family and his rationale for using specific phraseology, supported his notion of the term "spouses" as inclusive of survivors.

The judge also looked to Johnson's overall testamentary scheme in reaching his conclusion. The trusts created between 1939 and 1963 devised a comprehensive plan aimed at benefiting his heirs and their spouses. The judge noted that Johnson played an "active role" in editing the various testamentary documents, and

that he provided for surviving spouses in other trusts, including the 1939 trust, the 1944 trust, and the 1963 trust. The testamentary scheme led the judge to conclude that Johnson's "human impulses" were to include "surviving spouses within the broad concept of family." We agree. As the judge observed, "human experience teaches us that a husband does not lose his status as a spouse merely because his wife passes away." That common impulse also comports with Johnson's "dominant plan" to devise a broad class of potential beneficiaries and then delegate all distribution decisions to the trustees. Johnson's inclusion of surviving spouses in the trust does not guarantee that they will receive any income or corpus, but merely acknowledges them as part of the family.

In short, and notwithstanding his reliance on some testimony that should not have been admitted, there was substantial credible evidence in the record as a whole to support the judge's conclusion that Johnson wanted a broad class of possible beneficiaries, including surviving spouses. Certainly, there is no basis to characterize his decision as "so wholly insupportable as to result in a denial of justice." *Rova Farms, supra,* 65 *N.J.* at 483–84, 323 *A.*2d 495.

Therefore we affirm.

Justice HOENS, concurring in part and dissenting in part.

I write separately to concur in part and to dissent in part from the decision announced by the majority of the Court. I concur in the analysis of the meaning and the limitations of *N.J.R.E.* 701, the result of which is to exclude as inadmissible all of Hill's opinion testimony on which both the trial court and the Appellate Division majority relied. I dissent, however, from the majority's opinion to the extent that it concludes that the result reached by the trial judge, and affirmed by the majority of the appellate panel, can be sustained once that inadmissible opinion testimony has been excised.

Although correctly rejecting Hill's opinion testimony, my colleagues nonetheless conclude that there is "ample" admissible

evidence, largely from Hill, to sustain Richards' burden of proof with respect to the doctrine of probable intent. In concluding that there is sufficient credible evidence to support the trial judge's conclusion that Johnson intended to include surviving spouses as beneficiaries of this particular trust, the majority overlooks the inescapable fact that Hill's trial testimony was overwhelmingly comprised of statements that amount to nothing more than his opinion. Both the questions posed to Hill by counsel, and Hill's answers, were couched carefully in words that conveyed Hill's "impression," "belief," and "understanding" about Johnson. In doing so, however, Hill simply offered one opinion after another.

For me, the problem remains that when this voluminous trial record is stripped of all of the inadmissible opinion testimony, there are but three facts on which the trial judge, and the appellate majority, could have relied. The first, which in actuality is not a fact but a series of facts, is the overall plan evidenced in the various wills and trusts Johnson executed over time for the benefit of his family. The second fact is the comment Johnson made to Hill about the widow left without means to support her child when her spouse died. The last fact is Johnson's expressed concern for the protection of his family from the "vicissitudes of life."

I consider the first of these to be the most telling evidence about what Johnson himself actually intended. The majority is only partly correct in stating that "the trusts created between 1939 and 1963 devised a comprehensive plan aimed at benefiting his heirs and their spouses." *Ante* at 286, 944 *A.2d* at 595. In reality, as the record makes abundantly apparent, Johnson's several trusts had different aims; as time went on, the goals he told Hill and others he intended to achieve changed. Particularly as it relates to the later trusts, including the 1961 trust, Johnson was largely motivated by considerations only indirectly relevant to providing for his children.

His intentions are obvious from an examination of how the different groups of trusts evolved. The earliest ones were de-

signed specifically to provide for his children and their spouses. Thus, the 1939 trusts, created for the benefit of his children born of his marriage to his first wife, and the 1944 trusts, created for the benefit of his six children, all included references to the particular children. These early trusts also specifically included inheritance rights for the spouses of those children, should those spouses survive the Johnson children. The intention of these trusts, without any doubt, was the creation of financial security for each child, along with protecting the spouse and children of each of them. In these trusts, the intention to provide for the surviving spouses of his children was expressed and it was accomplished in part through the grant of a power of appointment by which Johnson's children could, effectively, pass the trust assets to a surviving spouse.

In fact, consistent with the terms of her 1944 trust, Mary Lea designated her surviving spouse, Richards, as the principal beneficiary of that trust upon her death. By doing so, she largely excluded her children, all of whom were grandchildren of Johnson and none of whom were children of Richards. Regardless of what Johnson might have thought of that outcome, by vesting his daughter Mary Lea with a right of appointment, he allowed her to direct that the majority of the corpus of that trust, in essence, provide for her surviving spouse, even to the exclusion of Johnson's own family members.

The record demonstrates that by the time Johnson created the 1961 trust, his overall estate plan strategy, as described by Hill, had changed. Johnson recognized that he had already provided directly for all of his children through the previously-created trust instruments. At the same time, he had amply created vehicles for the protection of their spouses and, to a lesser extent, consistent with the right of appointment, for their children. The primary goal to be accomplished by the creation of the 1961 trust, however, had nothing to do with providing for his children or their spouses, but instead related to the preservation of control of the Johnson &

Johnson Company ("the Company"), limiting payment of taxes and the protection of his grandchildren.

According to Hill, Johnson had long expressed his significant concerns about taxes and specifically considered the tax implications of much of what he did. He had two tax-related concerns that bore upon his creation of the 1961 trust in particular. First, he feared that the death of any family member would make it necessary for that family member's heirs to sell shares of the Company to generate the cash needed to pay estate and inheritance taxes. He repeatedly sought ways to reduce that likelihood because he wanted, above all else, to avoid dissipation of the family's control of the Company. Second, he was concerned that if there were a distribution from one of the trusts to one of his children and if that child wanted to share that distribution with a spouse, the distribution from child to spouse would require the payment of gift taxes. Both of these concerns are evident in the provisions of the 1961 trust.

By 1961, Hill had learned about a then-novel estate planning device through which a trust could be devoted to charitable purposes, which, when coupled with the use of a generation-skipping device, would reap significant tax advantages both to Johnson and to his grandchildren. It was these purposes, according to Hill's admissible factual testimony, that led to the creation of the 1961 trust. In doing so, however, Johnson was required to, and did, devote the 1961 trust to charitable purposes for thirty-five years. The trust, after that thirty-five year period of time, includes a period of years during which the trustees have discretion to make distributions to children, spouses, and grandchildren. When the trust terminates, however, neither Johnson's children (should any of them still survive) nor their spouses, are named as residuary beneficiaries. In fact, only Johnson's grandchildren and their issue fall within the class of permitted residuary beneficiaries.

These unrebutted facts support conclusions that are plain from the language of the 1961 trust, and are all consistent with John-

son's expressed (as opposed to probable) intent. First, by creating the charitable lead period, Johnson enabled himself to take advantage of the then-possible lifetime income tax exemption available to individuals who gave ninety percent of all of their ordinary income for a period of years to charity. Second, by permitting distributions to spouses of children following the charitable lead period, Johnson accomplished his expressed goal of reducing or eliminating the potential gift tax impact on a then-living child who might choose to share a permissible distribution with a then-living spouse. Third, by including his grandchildren as both permissible beneficiaries during the period of years and as the only residuary beneficiaries (to the exclusion of any of his own children who might be surviving), he effectively passed significant assets on to the succeeding generation.

Notwithstanding the use of the word "spouses" as it relates to Johnson's children's rights in the 1961 trust, the plain intent of this part of his estate plan was the generation beyond his children. The suggestion that in this particular trust he intended that a surviving spouse of one of his children, already well provided for through the use of the 1944 trust, would reap a benefit to the detriment of his grandchildren is simply without any support.

Nor, in my view, can it fairly be said that Hill's two other factual bases for his now inadmissible opinion about Johnson's intent support the findings of the trial court. The vignette about Johnson's concern for the widow and his expressed worry about life's vicissitudes reveal only that Johnson had a concern for his own children and grandchildren. These facts tell us little about any continuing concern Johnson had for his children's surviving spouses in 1961 who had all been provided for through the 1944 trusts. Moreover, these two factual tidbits tell us nothing at all when viewed in light of the very specifically expressed objectives Johnson sought to achieve in creating the 1961 trust.

Like the majority, I would ordinarily announce the appropriate legal test relating to the inadmissibility of Hill's proffered opinion testimony and remand to the trial court for its re-evaluation of the

record. I would ordinarily do so even though the trial judge has retired in the interim. The unfortunate passing of the principal witness Hill, however, leads me to agree with the majority that a remand is not feasible in these unique circumstances.

However, in the final analysis there is so little left of Hill's testimony, once his inadmissible opinions are put aside, and the overwhelming evidence that remains supports only the conclusion that Johnson did not intend that the surviving spouse of his child Mary Lea would be included in the class of permissible beneficiaries during the discretionary period under the 1961 trust. I, therefore, would reverse the judgment of the Appellate Division and remand with directions to the trial court to enter judgment in favor of the appellants.

Justice RIVERA-SOTO joins in this opinion.

*For affirmance*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, ALBIN and WALLACE—5.

*For concurrence in part, dissent in part*—Justices RIVERA-SOTO and HOENS—2.