**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3455-19

IN THE MATTER OF THE
ESTATE OF CHARLES A.
HOFFMAN, JR.,

     Deceased.

_____

Submitted February 2, 2021 – Decided March 10, 2021

Before Judges Yannotti, Mawla and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Warren County, Docket No. P-18-000368.

Stern Kilcullen & Rufolo, LLC, attorneys for appellants Catherine Oliver Brennan and Fred Oliver, Jr. (Robert W. Ferguson, of counsel and on the briefs).

Russo, Russo & Light, LLC, attorneys for respondent Eugene Hoffman, as Executor for the Estate of Charles A. Hoffman, Jr., (Michael J. Light, II, on the brief).

PER CURIAM

    Appellants Catherine Oliver Brennan (Catherine) and Fred Oliver, Jr.

(Fred) appeal from an order of the Chancery Division, Probate Part, dated

February 18, 2020, which found that a specific bequest to them in the Last Will and Testament of Charles A. Hoffman, Jr. (Charles) adeemed, meaning that the bequest was lost, disposed of, and no longer available.[1]  For the reasons that follow, we affirm.

## I.

We briefly summarize the relevant facts.  Charles was married to Marion Oliver Hoffman (Marion), who died intestate on June 1, 2016.  At the time of her death, Charles and Marion had been married more than fifty years.  They had no children, but apparently had a close relationship with Marion's brother and his three children, Patricia Oliver, Catherine, and Fred (the Olivers).  Charles was Marion's sole heir and he obtained letters of administration for her estate.  Charles died on April 4, 2018.

On October 1, 2018, Charles's brother Eugene Hoffman (Eugene) filed a verified complaint in the trial court seeking to have Charles's will admitted to probate.  Charles executed the will on August 2, 2016.  In the will, Charles appointed Eugene to act as executor of his estate and exercise all of the powers under N.J.S.A. 3B:14-23.

---

[1]  For ease of reference, we use first names to identify the decedent and others involved in this matter.

Charles also stated that his funeral expenses and the costs of administering his estate should be paid first out of his estate. He directed that all estate, transfer, succession, inheritance, and similar taxes, plus any interest and penalties, should be paid out of his residuary estate as "administration expenses." Charles then stated that all of his real and personal property shall be given to his brother Eugene, but if Eugene should predecease him, this property "should go" to Eugene's surviving children, Elena, Veronica, and Kevin, "per stirpes."

In the will, Charles also provided for the distribution of the residue of his estate. He devised "the total sum of monies" from the estate of his deceased wife, including bank accounts, certificates of deposit, stocks, and bonds, to be distributed to the Olivers, "per stirpes, as set forth on the attached Schedule A – (Numbers 2 and 3 only[)]."

In addition, Charles devised "all the rest residue and remainder of [the] estate," including the other bank accounts noted on Schedule A, to his brother Eugene. The will provided, however, that if Eugene should predecease Charles, the "rest residue and remainder" of the estate should be distributed to Eugene's surviving children "per stirpes." The will states that it was signed, sealed, published, and declared before two attesting witnesses.

A-3455-19

Schedule A was attached to the will.  Among other assets, it lists three accounts at First Hope Bank (FHB), with current balances of: $80,043.70 (Account #1); $69,254.33 (Account #2); and $213,321.57 (Account #3).  Schedule A also lists two accounts at PNC Bank, with balances of $40,046.79, and $145,347.85, respectively.

The Chancery Division judge issued an order to show cause dated October 1, 2018, which required, among other things, persons with interests under the will to show cause why the will should not be admitted to probate and Eugene appointed personal representative of the estate.  Catherine filed an answer to the complaint on November 21, 2018.  She admitted that Charles died on April 4, 2018, but neither admitted nor denied many of the allegations in the complaint.

The judge conducted a preliminary hearing on April 10, 2019, and issued an order that day, which admitted Charles's will to probate and appointed Eugene as executor of the estate.  The order also required Eugene to file a formal accounting with the court.  Eugene filed the accounting on August 23, 2019, with an attached letter from counsel identifying the estate's assets, including certain accounts at FHB.

After he filed the accounting, Eugene asserted that pursuant to the will, the Olivers were only entitled to the two accounts at FHB, which were

4

designated on Schedule A to the will as "Numbers 2 and 3." According to Eugene, those two accounts were closed at Charles's direction, and these bequests therefore adeemed.

On February 13, 2020, the judge conducted an evidentiary hearing to determine whether the bequests to the Olivers were specific and whether they adeemed. At the hearing, Eugene testified that he had a "very close relationship" with his brother Charles. He said Charles wanted to leave "some moneys" to the Olivers in accordance with his wife's wishes.

Eugene explained that the two accounts Charles referred to in his will as accounts "Numbers 2 and 3" had been transferred to Charles upon Marion's death. Eugene stated that when Marion died, the accounts had balances of about $68,000 and $213,000, respectively, but only $16,000 remained in the accounts at the time Charles died.

Eugene explained that the monies in the accounts had been spent on Charles's caregivers, hospital bills, and transportation costs, which "roughly came to about a $100,000 a year . . . ." He stated that money in the accounts had also been used to provide a bond for a sand and gravel business that was operated on Eugene's property.

5

Eugene said that to free up the monies in Marion's accounts, he had contacted FHB and arranged for bank employees to visit Charles's home to transfer ownership of the accounts to Charles. The monies then were deposited into an account from which Charles could write personal checks.

Eugene testified that Stephanie P. Tettemer, the attorney who drafted Charles's will, gave Charles permission to "invade the accounts" that had been in Marion's name to care for himself. He stated that Charles spent most of the money in FHB accounts "Numbers 2 and 3."

Eugene further testified that Charles would have used one of Marion's other accounts to pay his expenses, but the monies were not available. He explained that the accounts were at PNC Bank, but the officials at that bank would not visit Charles at his house so that he could sign the papers required to transfer the accounts to his name. Eugene also stated that monies in Charles's personal bank account were on "hold" because Charles's personal funds had been pledged as security for the restoration bond that Eugene required for his business.

Tettemer testified that on the day she first met Charles to discuss his will, he gave her a general description of what he wanted his will to provide. She stated that as she was leaving Charles's home, Charles tugged on her sleeve and

6

whispered for her to come back later that day. Tettemer returned that afternoon, and Charles told her he wanted to give his wife's "properties" to Marion's brother and his children. Tettemer testified that at their next meeting, she was given a Schedule A that listed various assets including certain bank accounts.

She said Charles had reduced the number of accounts that were going to go to Marion's nieces and nephew. Tettemer further testified that on the day Charles was to execute the will, he called her and told her the only change he wanted to make pertained to "Numbers 2 and 3" on Schedule A. As noted, the will specifically limited the bequest to the Olivers to those accounts.

Tettemer advised Eugene that although the will provided for the disposition of the bank accounts, Charles could use the money in any way he wanted during his lifetime because the accounts were not in a trust. She told Charles he could call her at any time if he ever wanted to make any additional changes to the will. He did not contact her again.

Catherine testified that she had a close relationship with her aunt Marion as they shared numerous interests together. She explained that after Charles executed his will, he became sick and was bedridden. She stated that at some point, Charles held up his will and proclaimed, "I've taken care of your family.

 A-3455-19

I've taken care of everything.  You don't have to worry.  You're not going to have any problems like we went through with Marion's estate."

Vincent Hoyd was a paralegal in Tettemer's office.  He said that he met with Charles at his home four times to discuss his will.  After he spoke with Charles, Hoyd informed Tettemer that Charles stated that he was comfortable at his home.  Tettemer's firm prepared Schedule A to the will, which listed the two accounts that would be given to Charles's nieces and nephew.

After hearing the testimony, the judge placed his decision on the record. The judge noted that in the will, Charles identified two bank accounts at FHB, which were to be transferred to his nieces and nephew upon his death.  The judge noted that Charles and Marion had no children, and Marion probably would have wanted her money to be given to members of her family.

The judge also noted that the funds in the two accounts at FHB that had been bequeathed to the Olivers in the will were used to pay Charles's expenses and funds in those accounts had been spent.  The judge noted that the accounts "were not placed in trust."  Rather, Charles had identified the accounts in the will, and Tettemer had advised Charles that "he could use those funds, if he wanted to, during his life."

A-3455-19

The judge found that when Charles died, the funds in the two accounts at FHB, which were identified as "Numbers 2 and 3" in the will, "did not exist." The funds had been used to pay Charles's expenses. The judge noted that Charles had required round-the-clock nursing care, and he had incurred medical bills. In addition, some of the monies in the accounts had been used for a bond for Eugene's business.

The judge determined that, while Catherine thought she had been treated unfairly, "the money never really belonged to her" unless it remained in the designated accounts when Charles died. The judge pointed out, however, that "[t]he funds were exhausted before that time." The judge found there was no proof of "undue influence" by anyone, and Charles had the right to dispose of the funds in the two accounts at FHB "as he saw fit" during his lifetime.

The judge therefore concluded that Charles's will included specific bequests of the two accounts at FHB, which were "Numbers 2 and 3" on Schedule A attached to the will. The judge found the specific bequest to the Olivers adeemed. Therefore, the judge dismissed the claim of those contesting the disposition of the estate.

The judge memorialized his decision in a judgment dated February 18, 2020. Catherine and Fred appeal.

A-3455-19

II.

Appellants contend the Chancery Division judge erred by finding that the bequest to them under the will was a specific bequest. They contend that in his will, Charles provided them a demonstrative bequest. We disagree.

Findings of fact by a judge sitting without a jury will not be disturbed on appeal unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" Seidman v. Clifton Savs. Bank, 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Trust Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)). The judge's findings are binding on appeal if "supported by adequate, substantial, credible evidence." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). However, an appellate court owes no deference to a trial judge's "interpretation of the law and the legal consequences that flow from established facts . . . ." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"The construction of a will is a function judicial and interpretive in nature . . . ." Guar. Tr. Co. of N.Y. v. Stevens, 28 N.J. 243, 254 (1958) (citing Leyendecker v. Leyendecker, 142 N.J. Eq. 449, 453 (E. & A. 1948)). When construing the provisions of a will, the court's "primary objective" is to

10

determine and "give effect to the probable intention of the testator." In re Estate of Nicol, 152 N.J. Super. 308, 312 (App. Div. 1977) (citing Fidelity Union Tr. Co. v. Robert, 36 N.J. 561, 564 (1962)). To determine the subjective intent of the testator,

> courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances. . . . So far as the situation fairly permits, courts will ascribe to the testator, "those impulses which are common to human nature, and will construe the will so as to effectuate those impulses." , , , [T]he court's endeavor is to put itself in the testator's position insofar as possible in the effort to accomplish what he would have done had he "envisioned the present inquiry."
>
> [Ibid. (alterations in original) (quoting Fidelity, 36 N.J. at 564-66).]

Furthermore, "all rules of interpretation are subordinated to the requirement that the actual purpose of the testator be sought and effectuated as far as is consonant with principles of law and public policy." Fidelity, 36 N.J. at 568 (quoting In re Fabbri's Will, 2 N.Y.2d 236, 239-40 (1957)); see also Polliak v. Smith, 19 N.J. Super. 365, 370 (Ch. Div. 1952) (stating that "the intention of the testatrix will prevail over technical rules and words in their technical or even ordinary meaning").

There are three types of testamentary gifts: general, specific, and demonstrative. Busch v. Plews, 19 N.J. Super. 195, 204 (Ch. Div. 1952), aff'd 21 N.J. Super. 588 (App. Div. 1952), aff'd 12 N.J. 352 (1953). A general legacy is "a bequest of personal property payable out of the general assets of the testator's estate rather than from specific property included therein." Plews, 12 N.J. at 356 (citing In re Low, 103 N.J. Eq. 435, 437 (Prerog. Ct. 1928)).

A specific legacy is "a bequest of personal property in specie and not payable from other assets of the estate." Ibid. (citing Camden Trust Co. v. Cramer, 136 N.J. Eq. 261, 270 (E. & A. 1945)). A demonstrative legacy is a "bequest payable primarily out of specified property but chargeable against other assets of the estate if that property is insufficient . . . ." Ibid. (citing Cramer, 136 N.J. Eq. at 270).

To render a bequest specific, a testator must have contemplated the subject of a legacy to be a specific identical thing. Plews, 19 N.J. Super. at 205. Absent such an intention, "a legacy will be deemed either general or demonstrative, depending upon whether a fund or particular property is indicated as the primary source of its payment." Ibid.; see also Cramer, 136 N.J. Eq. at 270 (stating that "[i]f the subject-matter is not sufficiently individuated, the legacy is treated as general or demonstrative"). Since specific legacies are subject to ademption and

12

thus typically frustrate the testator's donative intent, "courts lean against construing legacies as specific." Plews, 12 N.J. at 356 (citing Cramer, 136 N.J. Eq. at 270).

"In deciding whether a legacy is specific or general, the intention of the testator must control, as it must [control] the decision of every other question involving the construction of wills." Zorner v. Foth, 124 N.J. Eq. 508, 509 (Ch. Div. 1938). "There is no technical arbitrary rule requiring the use of particular words or expressions to make a bequest specific." Ibid. "The words of exclusion must" furnish "an almost infallible test of the meaning of the testator." Ibid.

On appeal, appellants argue Charles's legacy to the Olivers should be construed as demonstrative rather than specific. They note that in the will, Charles devised to the Olivers the "total sum of monies" that Charles had acquired from Marion's estate. They argue that while Charles expressly limited the gift to the accounts identified in the will, he intended the legacy would be paid from, but not exclusively from, those accounts.

We are convinced, however, that the record supports the trial court's conclusion that Charles intended the bequest to the Olivers to be a specific rather than demonstrative bequest. In the will, Charles stated that he devised to the Olivers "the total sum of monies" he had acquired from Marion's estate, but

13

limited that "sum of monies" to the accounts listed on Schedule A and identified as "Numbers 2 and 3 only."

The will does not, as appellants claim, grant the Olivers a legacy in a specific amount, to be payable from the estate. Rather, the will grants the Olivers monies in two specific accounts and states the gift is made as to those accounts "only." Thus, the will does not provide for a demonstrative legacy. It grants the Olivers monies in two specific accounts.

Moreover, Tettemer advised Charles he could use the monies in the accounts identified in his will during his lifetime. The evidence also showed that Charles elected to use those funds for his personal expenses because his other funds were not available. Before he died, Charles could have revised his will to ensure that the Olivers would receive a "sum of money." He did not do so, thereby confirming his intention to make a specific rather than demonstrative gift to the Olivers.

Appellants also argue that the overall structure of Charles's distributive scheme indicates that the bequests to the Olivers were demonstrative rather than specific. They assert that the limitation in the will to two specific accounts confirms that Charles intended to grant the Olivers a "total sum of monies" which Charles had acquired from Marion's estate. This contention is unavailing.

14

The phrase "total sum of monies" is defined not by a specific amount, but by reference to two accounts at FHB, which were identified as "Numbers 2 and 3" in the will and on Schedule A. The will states that Charles's bequest to the Olivers was "only" the amounts in these accounts, not a general bequest of a specific amount of money that would be paid from the estate.

Appellants further contend that Charles's handwritten reference to accounts "Numbers 2 and 3" shows he intended a demonstrative gift because he wrote in those references next to the current account balances for the two accounts, rather than the account numbers. Charles's placement of his handwritten references to "2" and "3" on Schedule A does not, however, warrant the conclusion that he intended to make a demonstrative gift of the balances in the accounts at the time he executed the will.

In the body of the will, Charles stated that he was devising to the Olivers a "total sum of monies" he had acquired from Marion's estate, but the devise was expressly limited to the accounts identified on Schedule A as "Numbers 2 and 3 only." Thus, Charles made abundantly clear that he intended to gift the Olivers the accounts identified on Schedule A as "Numbers 2 and 3 only."

Appellants further argue that the bequest to the Olivers should be deemed demonstrative because the will does not include language indicating that Charles

15

specifically intended that the gift be limited to the accounts identified. In support of this argument, appellants cite Zorner, 124 N.J. Eq. at 509. In that case, the will provided that "[a]ll the aforementioned bequests [of sums of money] to be paid . . . out of an existing bank account held in my name in the Rutherford National Bank . . . ." Id. at 509.

At the time of the testator's death, the amount of money in the bank was less than the aggregate of the bequests in the will, and the estate was insufficient to pay the bequests in full. Id. at 509. The legatees petitioned the court for the sale of certain properties to make up for the shortfall, contending that the bequests to them were general and therefore chargeable to the entire estate. Id. at 509. The court denied the request and held that the bequests were specific. Id. at 510.

The court noted that the language in the will, which "specifically provides that these bequests shall be paid out of a certain specified existing bank account[,]" was intended as a limitation of the fund out of which payment of the bequests were to be made. Id. at 510. The court also stated that "[t]he contention of the complainants would require that this clause be considered an utter nullity." Id. at 510.

A-3455-19

Appellants' reliance on <u>Zorner</u> is misplaced. Here, Charles's will states that the bequest to the Olivers is to be paid from specified bank accounts only. Had Charles intended to gift the Olivers a specific sum of money from the estate, he could have included such a provision in the will. He chose instead to give to the Olivers a sum of money on deposit in specific bank accounts. As the trial court held, the gift to the Olivers was specific, not demonstrative.

Appellants also rely upon <u>Patanska v. Kuznia</u>, 102 N.J. Eq. 408 (Ch. Div. 1928), <u>aff'd</u>, 104 N.J. Eq. 204 (E. & A. 1929). In <u>Patanska</u>, the testator bequeathed sums of money in various bank accounts to several legatees. <u>Id.</u> at 411. Before his death, the testator entered into a contract for the purchase of a building and made a deposit for the purchase. <u>Id.</u> at 409. The testator then became ill and was unable to complete the purchase of the building. <u>Ibid.</u>

Thereafter, he executed his will in which he bequeathed sums of monies in several bank accounts to several persons. <u>Ibid.</u> The will was drafted by a person who was not adept in the use of English or experienced in the preparation of such an instrument. <u>Id.</u> at 412. The testator later recovered from his illness and completed the purchase of the building. <u>Id.</u> at 410.

He thereafter withdrew more funds from the bank accounts, which he applied to reduce the mortgage on the building. <u>Ibid.</u> Consequently, there was

an insufficient amount of money in his bank accounts to pay the legacies provided under his will.  Ibid.

The court considered the circumstances surrounding the will and found that when the testator executed the will, he was contemplating death.  Id. at 412. Due to the serious nature of his illness, the testator also contemplated that he must forfeit the contract for the purchase of the building, leaving an estate which consisted almost entirely of money on deposit in a bank.  Ibid.  The testator's thoughts were focused on the natural objects of his bounty.  Ibid.

The court found that there was no indication in the will or elsewhere that the testator intended the bequests in his will would adeem if he withdrew money from the bank and used it to purchase the apartment building.  Id. at 412-13. The court found that by referring to the specific bank accounts in the will, the testator "intended to indicate [that] such funds [were] the primary source from which his bequests could be paid . . . ."  Ibid.

The court decided that the testator "did not intend that such portion of his estate as should be found on deposit in banks at his death should be the only source for the payment of legacies."  Id. at 413.  The court held that the bequests were general legacies and thus not subject to ademption.  Ibid.

Here, however, the language of the will and the circumstances are substantially different from those in Patanska. The will was drafted by Tettemer, an attorney, and the will specifically identified the two accounts from which the bequest to the Olivers would be paid. Moreover, there is no indication Charles intended that other assets of the estate would be used to pay the Olivers a specific sum of money if the amounts on deposit in the accounts identified on Schedule A were insufficient to pay that amount. As we have explained, in his will, Charles made clear that the bequests to the Olivers were of specific accounts "only."

## III.

Appellants further argue the trial court erred by finding that the bequest to the Olivers adeemed. Again, we disagree.

Specific bequests are unique because unlike general and demonstrative bequests, they are subject to ademption. Cramer, 136 N.J. Eq. at 270. In New Jersey, "[t]he test of ademption of a specific legacy . . . is whether the subject is 'lost, destroyed, or subsequently disposed of by testator, or so altered in form, by testator's subsequent acts, as to indicate a change of testamentary intent on his part.'" In re Estate of Hall, 60 N.J. Super. 597, 600 (quoting Chase Nat'l Bank v. Deichmiller, 107 N.J. Eq. 379, 382 (Ch. 1930)).

On the other hand, there is no ademption in the event the subject, "although somewhat changed in form, [is] not sufficiently changed to indicate change of testamentary intent . . . ." Ibid. (quoting Chase Nat'l Bank, 107 N.J. Eq. at 382). Furthermore, "[t]he rule that the non-existence of the subject of a legacy evidences its ademption is but a rule of evidence, rebuttable by other evidence indicating that ademption was not intended." White v. White, 105 N.J. Super. 184, 188 (Ch. Div. 1969) (quoting Donath v. Shaw, 132 N.J. Eq. 545, 549 (Ch. 1942)).

Thus, the "probable intent of the testator is the determining factor" in determining ademption. Id. at 187. However, the testator's intention is relevant "only when [the testator's] actions with reference to the subject matter of the bequest give rise to the inquiry as to whether there has been an ademption." Wyckoff v. YWCA, 37 N.J. Super. 274, 278 (Ch. Div. 1955).

Here, appellants argue that the overwhelming evidence presented at trial shows that Charles did not intend to disinherit the Olivers. They assert the witnesses at the hearing agreed that Charles wanted the money he acquired from Marion's estate to "go" to her "side" of the family. They assert that while Charles withdrew monies from the two accounts at FHB after he executed the will, he did not intend for the gift to the Olivers to adeem.

We are convinced, however, that the evidence supports the trial court's determination that the bequests to the Olivers adeemed. It is undisputed that when Charles executed his will, monies he had acquired from Marion's estate were on deposit in two accounts at FHB, and Charles intended to give the monies in those accounts to the Olivers upon his death. Even so, Tettemer advised that the monies in the accounts were not in a trust, and Charles could spend those monies, as he saw fit, during his lifetime.

The record shows that Charles did, in fact, spend almost all the monies in the two accounts he had intended to give the Olivers. Tettemer also told Charles he could contact her at any time if he wanted to change the terms of the will. Charles never contacted Tettemer and he did not revise the will, although he was apparently aware that he had used substantially all the monies in the two accounts at FHB to pay for his caretakers and other expenses.

Thus, the evidence does not support the conclusion that Charles did not intend the legacy to the Olivers to adeem. Indeed, the record shows that, to the extent he spent the monies in the two accounts at FHB during his lifetime, this is precisely what Charles intended.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21