**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1505-21

JANA M. WATTS,

     Plaintiff-Appellant,

v.

JOSEPH F. FARINELLA and
NICOLE FARINELLA,

     Defendants-Respondents.

_____

Submitted September 21, 2022 – Decided May 3, 2024

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0488-18.

Gillin-Schwartz Law, LLC, attorneys for appellant (Joseph Christoph Gillin-Schwartz, on the briefs).

Fox Rothschild LLP, attorneys for respondents (Adam Busler, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Plaintiff Jana M. Watts is the life tenant in possession of a waterfront home in Middle Township conveyed to her by her husband, Joseph A. Farinella, two months after he purchased the property and four years prior to his death in 2017. Defendants are his two children from a prior marriage, Joseph F. Farinella and Nicole Farinella, two of the three current remaindermen.[1] Plaintiff appeals following a two-day bench trial from the trial court's refusal to enforce a cost sharing agreement between herself and her late husband, the original remainderman, entitled "Expense Sharing Agreement Following Death of Remainderman."

Although convinced by the testimony of the decedent's lawyer, a longtime friend who drew the Agreement, and the decedent's accountant, a friend and business partner who advised him on it, that it was the decedent's intent to require the remaindermen to assume the costs of all "capital items," i.e., capital expenses over $5,000 during plaintiff's life tenancy, the trial court held "the decedent's intent cannot override the legal responsibilities imposed by our common law and statutes" on the life tenant to "maintain the property and avoid waste." Because that is an incorrect statement of the law, as it is the

---

[1] The third remainderman is Taylor Watts, plaintiff's daughter from a prior marriage.

A-1505-21

decedent's donative intent that controls the allocation of the costs of maintaining the property between plaintiff and the remaindermen during plaintiff's life tenancy, we reverse.

As we write only for the parties who are familiar with the facts and the history of the litigation, we limit our discussion to those points critical to our disposition of the case. When the decedent purchased the shore house, he and plaintiff were living together in plaintiff's home in High Bridge, as they had for fifteen years. The property, which they initially intended to use only as a summer home, is on a lagoon surrounded by a dozen or so houses leading to Muddy Hole and a channel to the intracoastal waterway and the Great Sound. It includes a dock and a boat slip.

Shortly after executing the life estate deed, the decedent and plaintiff entered into the "Expense Sharing Agreement Following Death of Remainderman," the express purpose of which was to "set forth the various items of financial responsibility concerning the Property during the term of [plaintiff's] Life Tenancy in the Property . . . following and only following, the death of [the decedent]."[2] The Agreement provides its terms "shall be binding

---

[2]  The Agreement states that during the time the decedent remains the remainderman, he "shall be primarily responsible for all Property expenses during the course of his life."

3

upon and inure to the benefit of [the decedent's] heirs, successors and assigns as regard their interest in the Property as set forth in the life estate deed."[3]

There are two operative paragraphs of the agreement. Paragraph 2 is captioned "[Plaintiff's] Responsibilities Following [The Decedent's] Death," and provides that for the balance of plaintiff's life following the decedent's death, she "shall be responsible for items generally associated with life tenants in property." The items include:

    a. All repairs concerning the Property and all maintenance items so that the Property shall be kept in good condition and state of repair, reasonable wear and tear excepted.

    b. All rents and charges for water and sewer and other similar items which are or may be assessed or imposed upon the Property.

    c. All utility charges including, but not limited to, electricity, heating, air conditioning and HVAC.

    d. All homeowner's insurance charges, including casualty and liability insurance[,] as well as such additional items as [plaintiff] and [the decedent] shall agree.

---

[3] The life estate deed states only that in the event the decedent predeceased plaintiff, the full fee interest at her death would vest in the decedent's "heirs, successors and/or assigns." Defendants were not specifically named. The Will the decedent executed in 2000 — and two subsequent codicils — make their remainder interests explicit.

e. All real property taxes and assessments imposed upon the Property by any governmental authority.

f. All items concerning the Property for which Life Tenants are generally responsible under the law of the State of New Jersey.

Paragraph 3 is captioned "[The Decedent's] Successors' Responsibilities," and provides that "[f]ollowing [the decedent's] death and during the balance of plaintiff's life, [the decedent's] successors, including his estate and its beneficiaries and distributees, shall be responsible for items generally associated with remainder interests in property, including but not limited to:

a. Maintaining in good working order all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other similar facilities on or placed upon the property.

b. Keeping the foundation, floors, walls, ceilings, windows, doors and roof reasonably watertight, rodent proof and in good repair.

c. All capital items arising with regard to the Property determined by and consistent with generally accepted accounting principles consistently applied, as well as all capital items for which remaindermen are generally responsible under the laws of the State of New Jersey."

5

Although aware their father had gifted plaintiff a life estate in the shore house, and that he intended for them and plaintiff's daughter to inherit the house following plaintiff's death, neither defendant had been aware of the cost sharing agreement or its terms prior to the issues giving rise to this litigation — that is, the neighbors' agreement to dredge the lagoon and the deteriorating condition of the home's bulkhead.

Albacore Lagoon is a short stub off Muddy Hole leading to Great Channel and the intracoastal waterway. Lagoon residents had for several years preceding these events endured an increasing amount of sediment in the lagoon, preventing them from using their boats during low tides. The decedent chafed at not being able to use his boat as he liked. He was active in the association formed to maintain the lagoon and participated on the subcommittee charged with exploring options for dredging the waterway to restore its former depth.

Unfortunately, the dredging project did not get underway prior to the decedent's passing in March 2017. In January 2018, the homeowners voted unanimously to hire a company to dredge the lagoon, agreeing to evenly share the $650,000 cost. As part of the project, the homeowners could arrange to have the dredging company dredge their boat slips, at their own cost. Plaintiff

6

elected that option. She paid just over $46,000 for her share of the dredging, including for the home's boat slip. The contract also included a "maintenance dredge" scheduled for 2022, for which plaintiff would be responsible for another $13,000 to $15,000.

Several residents joined together to replace their aging bulkheads at the same time, hoping to lower the costs. The decedent's pre-purchase home inspection prepared in 2013, reported the home's bulkhead was in poor condition, leaning outward with corrosion and deterioration of the metal fasteners and connectors evident. The inspector recommended an inspection "by a qualified specialist performing an in-water inspection." Plaintiff got an estimate of $33,000 to replace the bulkhead in 2017, not including permitting fees or engineering drawings. She planned instead to repair the bulkhead at roughly a third of the cost subject to the thoughts of the remaindermen.

In February 2018, plaintiff sent an email to defendants and her daughter with "a heads up" that

> [o]ur Albacore Lagoon Association has voted
> unanimously to go forward with the dredging. That
> means at low tide, there will be 3ft of water in the
> lagoon, so everyone can take their boats out anytime
> and enjoy full benefits of the lagoon. This will also
> add value to the house in the years to come . . . which
> is great for all of you. The dredging is slated to begin

7

in September.  Looks like my portion is $42,000, which includes dredging of the boat slip.

Bulkhead — many homeowners are getting brand new bulkheads which needs to get done before the dredging.  My quote was $33,000 . . . they would have to pull the whole bottom deck up and the steps . . . what a mess.  And way too much money.  I had Bob Geiske come and look at it and he can "shore it up" for only $9000 to $10,000.  He said it would last another 20 years.  I believe that's the way to go, unless you all think differently.

Obviously the timing of this is not the best on these capital improvements, but it is something that we will have to deal with.  Ultimately this improvement will have a positive impact on the value of the property in the future, especially down the road when it [is] yours.

Because this transaction is above my pay grade, I had my attorney look over the agreements and dredging details.  When I hear back from him, I'll let you know or have him email you all directly with the specifics.

If you have any questions, let me know.

In response, plaintiff received an email not from defendants, who were then in their mid-twenties, but from their mother stating, "[t]he children have asked me to discuss this matter on their behalf."  Defendants' mother wrote that she did "not believe these types of improvements are related to the deed that runs with the house," and asked plaintiff to share "any discussions or input from an attorney" as they'd "like some clarification about it."  Plaintiff

8

responded that her attorney "has all the particulars and will put something together." She also noted that "[t]his would be covered under the Shared Expense agreement that [decedent] had made up," attaching it to her email.

Two months later, plaintiff's counsel wrote to defendants and plaintiff's daughter about the dredging and the bulkhead, "two items that require attention under the terms of the Expense Sharing Agreement." Plaintiff's counsel contended both the dredging project and the bulkhead repair constituted capital items under the agreement and would thus be their responsibility as remaindermen and expressed plaintiff's willingness to discuss the matter in the hope it could be resolved amicably.

After defendants refused to contribute, plaintiff seven months later filed a four-count complaint to quiet title[4] and for breach of contract, waste and

---

[4] The life estate deed the decedent gave plaintiff in 2014 made her tenancy defeasible on the termination of their relationship, as specifically set forth in subsection D, paragraph 2 "Terms and Conditions of Life Estate." In November 2016, four months before his death and six months after his second codicil adding plaintiff's daughter as a remainderman, the decedent recorded another deed. This second deed, which was simply captioned "Deed," not "Life Estate Deed" as was the first deed, states: "The grantor grants and conveys (transfers ownership of) to Grantee all Grantor's right, title and interest in the property described below." The deed continues:

> Grantor's right, title and interest in the property are as
> described in a certain Life Estate Deed between

9

A-1505-21

unjust enrichment.  Defendants filed an answer, counterclaims for waste and breach of the implied covenant of good faith and fair dealing, and a third-party complaint for contribution against plaintiff's daughter, who defaulted.  The trial court entered summary judgment for defendants on plaintiff's breach of contract claim, finding defendants were not parties to the agreement, were unaware of its existence, and that neither plaintiff nor "the decedent had any

Grantor and Grantee dated February 10, 2014, and recorded with the Cape May County Clerk March 4, 2013 in Deed Book 3571, page 591.  All other provisions concerning ownership of the property as set forth in Paragraph 2 of said Life Estate Deed are hereby affirmed and ratified and all ownership interests described in said Paragraph 2 shall be unaffected hereby.

The court rejected plaintiff's testimony that the decedent intended to convey the property to her outright by the second deed based on its granting clause.  Instead, the court accepted decedent's attorney's testimony that the decedent intended only to eliminate his ability to terminate plaintiff's life estate by his second deed.  Because plaintiff has not appealed the decision that limits her interest in the property to a life estate, we do not consider whether the court's construction of the second deed is correct, beyond noting if that was indeed the decedent's intent, there would certainly have been plainer ways of expressing it.  See Estate of Colquhoun v. Estate of Colquhoun, 88 N.J. 558, 562 (1982) (noting "merger occurs upon uniting greater and lesser estates in the same person unless intent to the contrary"); Trenton Potteries Co. v. Blackwell, 137 N.J. Eq. 113, 116 (Ch. 1945) (expressing Judge Jayne's view that "[i]t is not of the nature of courts of equity to nourish the force of outworn formulas.  The efficient and equitable process of inquiry to-day is to scrutinize the whole instrument in quest of the true intentions of the parties rather than to attribute predominant significance to some formal division of the document.").

10

authorization to bind either defendant." The court rejected plaintiff's contention that the agreement was intended to supplement and be incorporated into the life estate deed to plaintiff, finding that even if true, it did not confer on plaintiff a cause of action for breach of contract against defendants. The parties' remaining claims were reserved for trial.

Although several witnesses testified for both sides, the critical testimony came from the decedent's lawyer and accountant, both of whom the court found extremely credible. The lawyer testified he'd known the decedent for about ten years, and that they had been friends before the decedent became his client. He also became a friend of plaintiff's at the same time, describing the couple as "two lovely people." According to the attorney, the decedent had two reasons for giving plaintiff a life estate in the shore house: it provided her "a place to stay for the rest of her life," and it made the asset, which the decedent had purchased for $575,000 in cash — "about all he had" — more unattractive to potential creditors.

Specifically, the attorney testified the decedent had been a homebuilder, but by the time he purchased the shore house, he was sick, winding down his business, and worried he might face "liability from a couple of real estate deals that were not going well." By burdening the shore house with a life estate, the

11

decedent, according to his lawyer, "was killing two birds with one stone." He was "making a testamentary conveyance in effect by the creation of the remainder interest," and "protecting . . . himself and [plaintiff], and his eventual beneficiaries from what he was concerned about with liabilities" by making the asset more unattractive to any would-be creditors.

As to the Expense Sharing Agreement, the lawyer testified it was the decedent's unequivocal intent to have plaintiff be responsible only for the regular maintenance expenses of the shore house, and to have defendants and plaintiff's daughter, who "would come into one hundred percent ownership one day," "accept the responsibilities [for capital items] from day one." According to the lawyer, the decedent, who had a law degree and long experience in business, viewed the shore house as "a gift" to his children and stepdaughter, the remaindermen, and believed that "[w]ith the benefits go the burdens."

The decedent also advised that he'd provided defendants "a buffer" from the hit of having to absorb their share of capital items for the house by giving them "some cash." According to the lawyer, "[t]hat's what the man wanted to do." And he "was comfortable with the whole thing," in that plaintiff "was taken care of" and he wasn't "throwing [defendants] to the wolves financially."

12

Defendants had the proceeds of his life insurance, and they and plaintiff's daughter "were going to own [the shore house] equally."

The lawyer testified the decedent was also comfortable that defendants and his stepdaughter would accept that "[s]hould anything go seriously wrong in a capital sense, it was their responsibility." According to the lawyer, the only reason defendants weren't advised of the Expense Sharing Agreement prior to the decedent's death is that he was adamant about not wanting his former wife, with whom "he had a bad relationship," to "become involved in any of this," telling the lawyer, "[i]t's just going to be trouble."

Appearing to confirm their father's expectation, one of the defendants, the decedent's daughter, then thirty-years-old, testified she would be willing to help with any of the repairs for which she was responsible as a remainderman, which she understood to mean capital expenses and "maintaining the structure of the house." She wasn't sure how those items were defined for the shore house, however, and wanted more information. She also testified she and her brother had each received about $350,000 in life insurance proceeds following their father's death.

The accountant testified he'd met the decedent in 1989 or 1990, as a client of the accounting firm where he was working. The two became friends,

and in 2000 teamed up to build some homes together, with the decedent responsible for the construction and the accountant responsible for the financing. According to the accountant, the decedent was "a smart guy," who had a very good relationship with both plaintiff and his children. The accountant was likewise a friend of plaintiff's.

The accountant had discussed the decedent's plan for the shore house with the decedent on several occasions, most recently in 2016 when the decedent told the accountant that the decedent had decided to make plaintiff's daughter a remainderman with an equal share to his children. The accountant testified to his understanding of the difference between repairs or ordinary maintenance and capital improvements "consistent with generally accepted accounting principles," by relying on the Internal Revenue Code's definition of capital expenditures, opining that replacement or repair of a bulkhead costing over $5,000 would be a capital expense, as would the replacement of a roof, or the dredging of a lagoon to provide better access to a dock adjacent to the property.

After hearing the testimony over the course of two days and reviewing the post-trial briefing, the court found plaintiff was sixty-five years old with a life tenancy in the shore house and defendants and plaintiff's daughter were

14

remaindermen.  The court also found defendants each received close to $350,000 from a life insurance policy taken out by the decedent and that "[t]he decedent intended for the defendants to 'step up to the plate' in the event capital expenses arose, i.e., items deemed a capital expense for accounting purposes to be the responsibility of the defendants."  The court accepted the accountant's testimony of the definition of a capital expense under the Internal Revenue Code and found that both the bulkhead repair or replacement, if over $5,000, and the dredging, which "provides better access to the attached dock" and "enhances the property value" qualified as capital expenses.

The court found the attorney's testimony "clear, unequivocal and consistent as to the decedent's intent [that the remaindermen bear responsibility for capital expenses during plaintiff's life tenancy] as well as to how the documents were drafted to reflect the decedent's intent."  It further found the accountant's testimony corroborated that of the attorney's, and that both enjoyed the decedent's confidence in their personal and professional relationships.  Notwithstanding, the court found "the decedent's intent, as expressed by credible witnesses, cannot defeat the legal rights and responsibilities imposed by the law" on the life tenant to keep the premises in good repair and not permit waste.

A-1505-21

The court found, as a matter of law, that "[t]he life tenant is inured with specific rights and responsibilities that cannot be supplanted by the decedent." The court further found that defendants were not aware "of the decedent's attempts to place financial responsibility on them while he was alive." Declaring that equity follows the law, the court found "in favor of the defendants . . . as their obligations are established clearly by statutes and precedent."

The court was further satisfied that plaintiff as a life tenant cannot assert a cause of action for waste against defendants and is unable to establish the elements of an unjust enrichment claim. The court dismissed all of defendants' counterclaims and declared the third-party complaint against plaintiff's daughter moot as a result of the dismissal of plaintiff's claims.

Plaintiff appeals the trial court's decision dismissing her waste and unjust enrichment claims and asserts that even if neither theory is one under which she can compel contribution from the defendants, the Expense Sharing Agreement and the testimony the court found credible establish the decedent intended defendants and plaintiff's daughter to assume responsibility for capital items exceeding $5,000, such as dredging the lagoon and boat slip and the repair or replacement of the bulkhead during plaintiff's life tenancy.

A-1505-21

Plaintiff contends the court erred, as a matter of law, by expressly disregarding the decedent's intent and holding defendants' can enjoy their remainder interests free of the conditions imposed by the decedent.  We agree.

Final determinations by the trial court following a bench trial "are subject to a limited and well-established scope of review."  Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011).  We will not overturn the court's "factual findings and legal conclusions . . . unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."  Ibid. (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008)).  That means "[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence."  160 West Broadway Assocs., LP v. 1 Memorial Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (alteration in original)).  Our review of the trial court's legal conclusions, of course, is plenary.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Because we think it beyond peradventure that plaintiff failed to state a claim for waste and unjust enrichment, we limit our discussion to her argument

that the court erred in finding New Jersey law required it to disregard decedent's intent as to how expenses were to be split between the life tenant and his successor remaindermen.

We begin our analysis by addressing defendants' assertion that we should affirm the trial court's decision because plaintiff failed to establish her claims of waste and unjust enrichment — the only two claims she has appealed — and ignore her claims about the decedent's intent, a consideration not relevant to either of those claims. Although that argument would ordinarily be persuasive, it cannot carry the day here.

Defendants open their brief to this court asserting that plaintiff "commenced this litigation" to compel them to pay "for (1) the costs to dredge the lagoon and boat slip adjacent to the Property (the 'Dredging Project') and (2) the costs to install a new bulkhead on the Property (the 'Bulkhead Project')." Likewise in its opinion, the trial court wrote that "defendants frame the salient issue as whether plaintiff has the ability to compel defendants to: (1) reimburse plaintiff for the cost of dredging the lagoon and boat slip adjacent to the property; and (2) pay for a new bulkhead."

Those statements make clear to us that was the case the court heard — whether plaintiff could compel defendants to pay for the dredging and the

18

bulkhead. Although the complaint may have been more artfully pled as a declaratory judgment action to resolve the parties respective obligations for capital expenses during plaintiff's life tenancy,[5] we cannot escape that was the case the parties tried and the court squarely resolved in holding "the decedent's intent cannot override the legal responsibilities imposed by our common law and statutes" on the life tenant to "maintain the property and avoid waste."

Neither the Court Rules nor our case law allows us to sidestep review of that ruling by limiting our consideration to the causes of action alleged in the complaint and ignoring the issue the parties determined to try to conclusion. See R. 4:9-2 ("When issues not raised by the pleadings and pretrial order are tried by consent or without the objection by the parties, they shall be treated in all respects as if they had been raised in the pleadings and pretrial order."); 68th St. Apts., Inc. v. Lauricella, 142 N.J. Super. 546, 561 n.3 (Law Div. 1976) (noting a legal theory not advanced in the pleadings or pretrial order but fully aired at trial and in the post-trial briefs, is properly relied on in determining the issues), aff'd o.b. 150 N.J. Super. 47 (App. Div. 1977).

---

[5] Plaintiff notes she included in her claim for relief in her complaint a request for judgment that "[d]efendants are responsible for the cost of dredging and bulkhead repair, which are both capital items."

Thus, the sole issue on appeal is whether plaintiff can compel defendants and her daughter, the remaindermen, to reimburse plaintiff for the cost of the dredging and repair or replacement of the bulkhead in accordance with the Expense Sharing Agreement. The trial court, although satisfied "[t]he decedent intended for the defendants to 'step up to the plate' in the event capital expenses arose" for the shore house; that the Expense Sharing Agreement was drafted to reflect decedent's wishes and accurately conveyed the decedent's intent that during plaintiff's life tenancy the remaindermen bear responsibility for capital expenses, that is "any amount over $5,000 paid out for . . . permanent improvements or betterments made to increase [its] value," including amounts expended for restoration; and that both the dredging and the repair or replacement of the bulkhead, if exceeding $5,000, would qualify as capital expenses, found it could not give effect to that intent because the decedent's intent could not supplant the responsibilities imposed by law on life tenants.

Our law, however, is to the opposite. The shore house property was the decedent's gift, first to plaintiff, his wife and longtime companion, for her life and then over to defendants, his children, and plaintiff's daughter, his stepdaughter, in fee, each having one-third interest. It has long been the law in

A-1505-21

this State that the court's primary goal in interpreting a will, a trust or other donative document "is to fulfill the settlor's intent." In re Trust of Nelson, 454 N.J. Super. 151, 158 (App. Div. 2018).

New Jersey follows the Restatement approach that "[t]he organizing principle of . . . donative transfers is freedom of disposition. Property owners have the nearly unrestricted right to dispose of their property as they please." Restatement (Third) of Prop.: Wills and Donative Transfers § 10.1, cmt. a (Am. L. Inst. 2003). The comment to section 10.1 explains "this fundamental principle by stating two well-accepted propositions: (1) that the controlling consideration in determining the meaning of a donative document is the donor's intention; and (2) that the donor's intention is given effect to the maximum extent allowed by law."[6] Ibid. And in determining that intent, "all relevant evidence, whether direct or circumstantial, may be considered, including the text of the donative document and relevant extrinsic evidence."

---

[6] The comment to section 10.1 explains "American law curtails freedom of disposition only to the extent that the donor attempts to make a disposition or achieve a purpose that is prohibited or restricted by an overriding rule of law," such as those "provisions promoting separation or divorce; impermissible racial or other categoric restrictions; [and] provisions encouraging illegal activity." Restatement (Third) of Prop. § 10.1 cmt. c.

A-1505-21

<u>In re Trust Created By Agreement Dated December 20, 1961, ex rel. Johnson</u>, 194 N.J. 276, 282 (2008) (quoting <u>Restatement (Third) Prop.</u> § 10.2).

The rules governing relations between life estate holders and remainderman are not to the contrary. "As a general rule, where the creator of the life estate <u>did not provide otherwise</u>, ordinary repairs, incident to the life tenancy and necessary to the property's preservation, must be made by the life tenant and at the life tenant's own expense." <u>2 Thompson on Real Property</u>, § 19.09 (Thomas ed. 2024) (emphasis added). <u>See</u> <u>Tichenor v. Mechanics & Metals Nat'l Bank</u>, 96 N.J. Eq. 560, 561 (Ch. 1924) (looking to the testator's intent to determine whether a life tenant permitted under the terms of a will to live "rent free, but at her own expense for the upkeep thereof," was to "be charged with the payment of taxes and other charges against the property"); <u>see also</u> <u>Kruse v. Meissner</u>, 136 N.J. Eq. 209, 211 (E.&A. 1945) (determining whether the testator in bequeathing to the defendant "the right to occupy and enjoy the use of my house . . ., without cost or hindrance to him in any way," intended the defendant to collect the rents from the upstairs apartment without paying "any of the operating or maintenance charges of the premises").

Although there is no question but that "[a] life tenant generally has the duty to keep the property in as good repair as when his estate began, not

excepting ordinary wear and tear," <u>Burlington Cnty. Trust Co. v. Kingsland</u>, 18 N.J. Super. 223, 233 (Ch. Div. 1952), the rule applies only if the owner has not specified some other intent; <u>see</u> <u>Restatement (First) of Prop.: Estates for Life</u> § 141 (Am. L. Inst. 1936) ("The creator of an estate for life can increase or decrease the duties described in §§138 [Duty Not to Diminish Market Value of Subsequent Interests], 139 [Duty Not to Permit Deterioration of Land or Structures], and 140 [Duty Not to Make Changes in the Premises] by manifesting an intent to that effect in the creation of such estate."). <u>See also</u> A.M. Swarthout, Annotation, <u>Rights and Duties of Life Tenant and Remainderman (Income and Corpus) with Respect to Repairs and Improvements</u>, 175 A.L.R. 1434 (1948) ("A number of recent cases illustrate . . . that the question whether the cost of repairs shall be borne by the life tenant or the remainderman is entirely within the control of the creator of the successive estates.").

The draft <u>Restatement (Fourth) of Prop.: Liability for Waste</u> § 5.1 (Am. L. Inst., Tentative Draft No. 3, 2002), makes the role of waste as "gap-filler" explicit: "Waste has always been understood to be a default rule, i.e., a

23

background rule that parties are free to alter by agreement."[7] Id. at cmt. b.

The comment continues: "Consistent with this intent-based focus on waste, the common law recognizes that acts or conduct that would otherwise constitute waste may be authorized by an appropriate provision in the instrument creating the interest so as to relieve the party of liability." Ibid.

Today, "the issues covered by the action for waste are usually resolved . . . by interpreting a lease, trust, or other legal instrument."[8] Id. at cmt. a.

As we have no quarrel with the trial court's fact-findings, and no doubt it correctly interpreted the decedent's intent expressed in the Expense Sharing Agreement, based on the credible evidence adduced at trial, that the decedent intended the remaindermen to bear the cost of capital expenses over $5,000 during plaintiff's life tenancy — and provided defendants a fund out of which to do so — we reverse the order on appeal and remand for the entry of

---

[7] For a cogent explanation of the scattering of the related topics of life estates, wills and donative transfers and liability for waste across the First, Third and Fourth Restatements, see Thomas W. Merrill, The Restatement of Property: The Curse of Incompleteness, in The American Law Institute: A Centennial History 203 (Andrew S. Gold & Robert W. Gordon eds., 2023).

[8] Although we do not disagree with the entry of summary judgment to defendants on plaintiff's breach of contract claim, that ruling does not preclude plaintiff's enforcement of the decedent's allocation of capital expenses between herself and the remaindermen attendant to the decedent's right to dispose of the shore house property as he chose.

24

judgment for plaintiff. The court should also reinstate and adjudicate defendants' third-party complaint for contribution against plaintiff's daughter. We do not retain jurisdiction.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION